**Norfolk**

NORFOLK DIVISION OF SOCIAL SERVICES

v.

UNKNOWN FATHER

No. 0119-84

NORFOLK DIVISION OF SOCIAL SERVICES

v.

LLOYD WILLIAMS, et al.

No: 0120-84

T.L.W., an infant

v.

UNKNOWN FATHER, et al.

No. 0014-85

A.K.W., an infant

v.

UNKNOWN FATHER, et al.

No. 0044-85

Decided June 17, 1986

422

COUNSEL

Martha G. Rollins, Assistant City Attorney (Philip R. Trapani, City Attorney, on brief), for Norfolk Division of Social Services.

Jack B. Stokes for T.L.W.

Robin L. Tolerton (Smith & Tolerton, on brief), for A.K.W.

David L. Williams (Andrew M. Sacks; Sacks, Sacks & Larkin, on brief), for Lloyd and Colleen Williams.

No brief or argument for appellee Unknown Father.

OPINION

**HODGES, J.**—These four cases consolidated for purposes of appeal concern various orders of the circuit court relating to the custody of the son of an unwed minor. The cases arose from the filing of two petitions: (1) a petition filed by A.K.W., the mother of the child, requesting approval by the juvenile and domestic relations district court of an entrustment agreement entered into between her and the Norfolk Division of Social Services; and (2) a petition filed by Lloyd and Colleen Williams, the grandparents of the infant, requesting the court to grant custody to them. The two matters were heard on January 27, 1984. The court approved the agreement and denied the grandparents' custody request. Both cases were appealed to Circuit Court of the City of Norfolk.

The circuit court heard the appeals at the same time. The court reappointed the guardians *ad litem* for A.K.W., the infant and the unknown father. In addition, it held that Lloyd and Colleen Williams were proper parties to intervene in the entrustment agreement case. In the final order, it held that A.K.W. was under the influence of duress at the time she entered into the entrustment

agreement and that it was, therefore, null and void. The court awarded care and custody of the infant to Lloyd and Colleen Williams pending further order of the court. On the motion of the division of social services, we granted a stay of the transfer of the infant to his grandparents pending appeal. We hold that the evidence of fraud and duress was insufficient as a matter of law to void the entrustment agreement. For this reason, we reverse.

I.

The petition filed by A.K.W. pursuant to Code § 16.1-241(A)(4)[1] on October 14, 1983, alleged that the infant's father was unknown, that the infant was the subject of an entrustment agreement and requested that the juvenile and domestic relations district court terminate the residual parental rights of A.K.W. and those of the unknown father pursuant to Code § 16.1-283. The petition further requested that the child's custody be awarded to the Norfolk Division of Social Services for adoption planning.

The entrustment agreement, dated September 7, 1983, states that A.K.W. "after due consideration of all practicable alternative plans for future of the aforesaid child, hereby agrees to surrender by this Entrustment Agreement and does hereby surrender all legal custody of and to the aforesaid child to aforesaid Board." The agreement further recites that A.K.W. understood that her separation from the child would be permanent and that all parental rights and obligations to the child would be terminated as of the effective date of the agreement. Finally, the agreement provides that after September 22, 1983, the agreement could not be revoked.

On October 20, 1983, Colleen and Lloyd Williams filed a petition for custody of the child, stating that the father was unknown and alleging that the child's custody required determination since he was presently in child care pending adoption planning.

[1] Code § 16.1-241 reads in pertinent part as follows:

[E]ach juvenile and domestic relations district court shall have . . . exclusive original jurisdiction . . . over all cases, matters and proceedings involving:

A. The custody, visitation, support, control or disposition of a child: . . .

4. Who is the subject of an entrustment agreement entered into pursuant to § 63.1-56 or § 63.1-204 or whose parent or parents for good cause desire to be relieved of his care and custody.

After the juvenile and domestic relations district court terminated all parental rights of A.K.W. and the father of the infant and awarded custody to the Norfolk Division of Social Services for adoption planning, an appeal of the order of termination was noted by Keith Thurman, guardian *ad litem* for the unknown father. Lloyd and Colleen Williams also noted an appeal to the denial of their custody petition.

## A.

The division of social services and the guardian *ad litem* for the child first argue that the guardian *ad litem* for the unknown father had no standing to appeal the entrustment agreement decision by the juvenile and domestic relations district court. They argue that the unknown father was given proper notice of the January 28, 1984 hearing in juvenile court, and when he did not appear his representation by his guardian *ad litem* ceased. However, it is clear from the record that if the guardian *ad litem* had not appealed the juvenile court decision to the circuit court, none of the evidence elicited in circuit court about the father's identity would have been developed.[2] By pursuing the appeal, the guardian *ad litem* protected whatever rights the "father" of the child had. The guardian properly pursued all leads to determine the father's identity so that the father would not be ignored in the proceeding terminating parental rights.

The guardian *ad litem* was originally appointed in the juvenile and domestic relations district court.[3] The division of social services presented A.K.W.'s affidavit proclaiming the father to be "unknown," yet the guardian informed the circuit court: "I think there is evidence to offset the affidavit that the party knows who the father is. So I appealed. . . ."

---

[2] Pursuant to information elicited from A.K.W. in a hearing on April 6, 1984, one of the two individuals who was thought to be the father of the infant was contacted. On May 14, 1984, a hearing was held to determine what interest he had, if any, in the infant's custody. While he indicated a desire to have custody of the child when his financial condition improved, an H.L.A. blood test dated May 15, 1984, excluded him from possible paternity of the child. The other possible father identified by A.K.W. died on February 19, 1983.

[3] Code § 16.1-268 reads in pertinent part as follows: "The attorney so appointed shall represent the child or parent . . . at any such hearing and at all other stages of the proceeding unless relieved or replaced in the manner provided by law."

■ The duties of a guardian *ad litem* cannot be specifically spelled out as a general rule, but the underlying criteria are stated in Code § 8.01-9: "Every guardian ad litem shall *faithfully represent the estate or other interest of the person* under a disability for whom he is appointed, and it shall be the duty of the court to see that the interest of such defendant is so represented and protected."[4] (emphasis added). In the juvenile and domestic relations district court, counsel may be appointed guardian *ad litem* to represent the interest of a parent in cases where the custody of the child requires determination. Code § 16.1-266(D). Pursuant to Code § 16.1-266 the attorney so appointed shall represent the parent at any hearing held and at all other stages of the proceedings until relieved or replaced in a manner provided by law. Code § 16.1-268.[5]

## B.

The division of social services and the guardian *ad litem* for the child contend that the approval by the juvenile court of the entrustment agreement was not appealable by the unknown father's guardian *ad litem* since there was no "real" person in interest to be protected. Based upon this reasoning, the division of social services filed a motion with the Circuit Court of the City of Norfolk to dismiss the appeal and remand it to the juvenile and domestic relations district court. The division's contention was that the unknown father was given statutory notice of the hearing in the juvenile court, failed to appear, and was, therefore, not a "party" entitled to pursue the appeal. The certification on the motion made by the division stated that a copy was mailed to all attorneys involved in the entrustment case. No copy of the motion appears to have been sent to counsel for Lloyd and Colleen Wil-

---

[4] A guardian *ad litem* may consent, on behalf of his wards, for removal of a case from one court or another. *Lemmon* v. *Herbert*, 92 Va. 653, 659, 24 S.E. 249, 251 (1896). And a guardian *ad litem* may appeal an adverse ruling of the court. *Givens* v. *Clem*, 107 Va. 435, 437, 59 S.E. 413, 414 (1907); *see also Bruce* v. *Dean*, 149 Va. 39, 52, 140 S.E. 277, 282 (1927).

[5] We note that the duties of a guardian *ad litem* when representing an infant are to defend a suit on behalf of the infant earnestly and vigorously and not merely in a perfunctory manner. He should fully protect the interest of the child by making a bona fide examination of the facts and if he does not faithfully represent the interest of the infant, he may be removed, 9B Michie's Jurisprudence *Infants* § 31 (Repl. Vol. 1984). The duties of a guardian *ad litem* are the same when representing any person under a disability, including an unknown parent.

liams. The cover letter which accompanied the motion asked that social services be advised if the court desired a hearing. No hearing was held on the motion, but an order was entered by the court on February 17, 1984, dismissing the appeal and remanding the case to the juvenile court.

During one of the initial hearings in circuit court, the parties argued the validity of the remand order. The unknown father's guardian *ad litem* contended that the order should not have been entered without a hearing, and stated that he had information that the father was not, in fact, unknown. The division of social services contended then, and contends now, that the initial order was properly entered and, even if not properly entered, could not be vacated more than twenty-one days after entry. After a hearing before the judge who originally entered the remand order, it was vacated and declared void *nunc pro tunc*.

We address this contention first, since its determination would end all other inquiry if the division were correct. However, we find no merit in the argument. The division contends that no party requested vacation of the remand order within twenty-one days of entry, and therefore, the court could not vacate the order after that time according to Rule 1:1[6] and *Godfrey* v. *Williams*, 217 Va. 845, 846, 234 S.E.2d 301, 302 (1977).

The *Godfrey* case involved a judgment awarded on September 8, 1975, to the plaintiff against one defendant, but a finding in favor of other defendants. Subsequently, on September 29, 1975, the court entered, *ex parte*, an order purporting to extend the time period established by Rule 1:1 during which the court could retain jurisdiction of the final judgment for purposes of vacation and/or modification. On October 28, 1975, the trial court vacated the September 8 judgment and ordered a trial *de novo*. After the second trial on December 12, 1975, the court found in favor of *all* defendants. The plaintiff appealed and the Supreme Court reversed the December 12 judgment order and reinstated the September 8 judgement order. It held that the September 29 order did not modify or vacate the judgment of September 8, and that neither the September 29 order nor the October 28 order vacating

---

[6] Rule 1:1 in pertinent part reads: "All final judgments, orders . . . shall remain under the control of the trial court and subject to be modified, vacated, or suspended for twenty-one days after the date of entry, and no longer."

the judgment were valid since the court lacked authority to extend the twenty-one day period prescribed by Rule 1:1. *Id.*

█ The question here, however, is whether the order remanding and dismissing the termination petition was void *ab initio.* If it was, Rule 1:1 could not bar subsequent vacation of the order. Appellees contend that Rule 1:13 mandates that:

[D]rafts of orders and decrees shall be endorsed by counsel of record, or reasonable notice of the time and place presenting such drafts together with copies thereof shall be served by delivering or mailing to all counsel of record who have not endorsed them. Compliance with this rule and with Rule 1:12 may be modified or dispensed with by the court in its discretion.

They argue that the division's failure to comply with Rule 1:13 made the remand order void and that it could be vacated at anytime upon proper application. They cite *Cofer* v. *Cofer*, 205 Va. 834, 140 S.E.2d 663 (1965), for support.

In *Cofer*, the wife moved the court to vacate an order which granted her husband a reduction in child support payments and relief from payment of support arrearages. The wife contended that the order was void since Rule 2:18 had not been followed.[7] That Rule required either endorsement by counsel of record or notice of the time and place when the order would be presented for entry. The Supreme Court agreed with the wife's contention and reversed the trial court's refusal to vacate.

The appellee argues that under the provisions of Rule 2:22 of the Rules of the Court the order of September 4th became final and was not thereafter "subject to be modified or vacated." The ready answer is that this rule is not a limitation on the power and authority of the court to vacate a void order. It is well settled that a void decree or order is a nullity

---

[7] The husband contended that Rule 2:19 vested the court with the discretion to "modify the requirements" of Rule 2:18 in appropriate situations. The court order reflected that the requirements of Rule 2:18 were dispensed with since the wife had failed to answer the petition within the time limit set by the court. *Cofer*, 205 Va. at 836-37, 140 S.E.2d at 665.

> and may on proper application be vacated at any time.[8]

*Id.* at 837, 140 S.E.2d at 665-66. (citations omitted); *accord Matthews* v. *Commonwealth,* 216 Va. 358, 359, 218 S.E.2d 538, 540 (1975); *see also Virginia Department of Corrections* v. *Crowley,* 227 Va. 254, 260, 316 S.E.2d 439, 442 (1984).

We hold that the circuit court possessed the authority to vacate the remand order since the order was *void.* The order of February 17 was only endorsed by the attorney for social services and was not endorsed by, nor was notice given to, A.K.W.'s guardian *ad litem,* the infant's guardian *ad litem,* or the unknown father's guardian *ad litem.* Moreover, the order was entered by the circuit court without notice of a hearing date to the opposing parties, and was clearly not in compliance with Rule 1:13. Nothing in the order itself indicated that compliance with Rule 1:13 was being waived by the parties and the order reflected no decision by the court that compliance was being modified or dispensed with for good cause. Absent waiver or a ruling by the court that compliance with the Rules of Court would not be required for good cause, we hold that the order was void *ab initio* and was properly vacated.

Counsel for the unknown father was conscientiously fulfilling the duties which his appointment placed upon him, and we reject the contention that he could not appeal the entrustment decision.

## II.

The final order entered by the circuit court voided the entrustment agreement and granted custody to the grandparents. The order reflects that the court reached this conclusion because it found that A.K.W. entered into the agreement while under the influence of fraud and duress. The division of social services, the guardian *ad litem* for A.K.W. and the guardian *ad litem* for the infant noted their appeal from this order. We find that the evidence of fraud and duress was clearly insufficient as a matter of law to void the agreement.

The evidence revealed that A.K.W. had experienced a difficult childhood. Her father and mother separated while they were living

---

[8] Rule 2:22 is the predecessor to present Rule 1:1.

in Richmond and around the same time her mother discovered that she had cancer. A.K.W. was six and a half years old when her mother died. In 1973, prior to her mother's death, A.K.W. and her half-sister were sent to live with Lloyd Williams when A.K.W.'s mother realized that her emotional state prevented her from properly caring for the children. There was evidence that A.K.W.'s mother had physically abused her. When Lloyd Williams was unable to balance working and taking care of the children, he placed them in St. Joseph's Villa, a group foster home located in Richmond, where they remained for a year. Subsequently, when Lloyd believed that his deceased wife's family was going to try to obtain custody of both children, he asked his sister, Nell Hooks, to take custody of A.K.W. The half-sister went to live with her mother's family. Nell Hooks and her husband became A.K.W.'s legal guardians in 1974, and she lived with them from the middle of 1974 until December, 1976, when she went to live with her father and his new wife, Colleen.

In 1981, when she was thirteen years old, A.K.W. ran away to Florida with her seventeen year old boyfriend and another girl who was a foster child in Lloyd and Colleen's home. This incident, and growing conflict between A.K.W., Lloyd and Colleen, led to her admission to the Community Health Center and Psychiatric Institute in Norfolk in August of 1981. She was subsequently discharged and returned to live with her father and step-mother in January of 1982.

A number of witnesses testified to discussions they had with A.K.W. concerning alternatives to adoption. Michael Williams (no relation), a juvenile court probation officer, testified that A.K.W. wished to relinquish her parental rights because she felt she was unprepared to assume parental responsibilities, and because she desired to continue her education. She did not want her father and stepmother to have custody because: "She did not want the child to be raised the way she was, to go through what she went through in upbringing in the hands of Colleen and Lloyd Williams." In making his report, the probation officer considered the effect that custody of the infant by Lloyd and Colleen might have on their relationship with A.K.W., and thought that the child would eventually be caught in the middle of continuing con-

flict between A.K.W., Lloyd and Colleen.[9]

When A.K.W. executed the entrustment agreement, Alexis Zoss, the social worker for the infant, prepared for the court a Foster Care Plan Transmittal. Zoss testified that she and A.K.W. discussed the implications and ramifications of the decision facing her and she advised A.K.W. of the permanent nature of the agreement. Zoss stated that: "The mother was rather adamant that family members not receive custody of the child." The alternatives they discussed included keeping the child and receiving ADC (Aid to Dependent Children), placing the child with grandparents, or placing the child in temporary foster care until A.K.W. could finish school and provide support for herself and her son. Zoss thought A.K W. was a rather mature, strong young mother who was making a positive effort to solve some of her problems. After the entrustment agreement was signed, Zoss visited A.K.W. on several occasions before advising her that the next step was to petition the court for approval of the agreement. She noted that as of January of 1984, A.K.W. had remained steadfast in her decision to place her son for adoption.

Lloyd Williams testified that when he and his wife first learned that A.K.W. was pregnant, they discussed alternatives with her. The pregnancy was too advanced for abortion. Therefore, the child could either be raised at home with their help, or given away at birth. They told A.K.W. that it was her decision to make and that they would fully support her in any decision. A.K.W. decided to keep the child. Lloyd noted that if A.K.W. had "decided to give it [sic] away at birth, I would have backed her decision then at birth."

A.K.W.'s aunt, Mary Williams, said A.K.W. told her "she wanted the child to be put up for adoption so he would have a normal, happy growing-up home." A.K.W. explained that she wanted to finish school and did not feel that she could do that and care for her son.

The testimony of A.K.W.'s aunt, Nell Hooks, appears to have influenced the court in its decision that A.K.W. had been coerced

---

[9] Lloyd and Colleen told him that they would send the child next door or somewhere else when A.K.W. came to visit so that she would not have to have contact with him. They hoped that A.K.W. would eventually change her mind and want the child back, and indicated they would not be "mom and dad" to the child, but grandparents.

into signing the entrustment agreement. However, after a thorough review of her testimony and that of the other witnesses, we find a lack of evidence of fraud or duress. Nell Hooks had a unique relationship with A.K.W., and A.K.W. probably trusted and confided in her more than other family members at the time she decided to put her son up for adoption.

Nell Hooks, Lloyd William's sister, is employed in a well-paying position, is married to a successful local contractor, and lives in an affluent neighborhood in Virginia Beach. She was still A.K.W.'s legal guardian at the time of the hearing in this matter.

When A.K.W. left home with her son after an argument with her step-mother in September of 1983, she went to Nell Hooks' home in Virginia Beach. The next day, she and Nell discussed her alternatives. A.K.W. asked if she could come back to live with the Hookses, and they discussed foster care, adoption and the possibility of returning to live with Lloyd and Colleen. Two days later, A.K.W. told her that she had decided that putting her son up for adoption was the best alternative. Hooks readily admitted that she thought all along that the child should have been put up for adoption at birth. In fact, she testified that she had agreed to pay A.K.W.'s hospital bill for the birth, but when she discovered that A.K.W. was going to keep the child she refused to do so. Nell Hooks believed that the infant should have the chance to grow up in a normal family environment with a mother and father to take care of him. While she had expressed to Lloyd and Colleen her belief that the child should be put up for adoption when he was born, she said that she had not discussed her opinion with A.K.W. She admitted that it was her position that A.K.W. could not stay with her *and* keep the baby.

A.K.W. testified that she had a good relationship with her father, but her relationship with her stepmother was only fair, in part because Colleen had come between her and her father. She admitted that an argument with Colleen spurred her departure with her son from her father's home in September of 1983, but she said her belief that adoption was the best alternative for T.L.W. was based upon the following factors: (1) her own upbringing, i.e., being switched from place to place and never being able to put a finger on who her mother was; (2) that she did not want the child to be exposed to physical and/or verbal abuse from her father and step-mother; (3) that adoptive parents were better

able to provide financial and emotional security; and (4) that she wanted to finish her education.

A.K.W. was counselled by and discussed alternatives with a social worker at social services. Two or three days later she signed the entrustment agreement. She admitted that seeing her son when she visited his foster home upset her, but she knew that entering into the entrustment agreement was the right thing to do. She also testified that no one pressured her into her decision. When asked if she had changed her mind about giving her son up in the two to three day period after leaving home, she testified:

> Not two or three days. I had been thinking about it before I left home . . . I felt I couldn't approach my parents because I didn't think they'd understand. When we were discussing possibilities and alternatives, they told me if I decided to keep him and two or three or four months later if I couldn't handle the responsibility, I could still give him up for adoption if I felt comfortable with it.

She admitted that she had not expressed that view to anyone prior to September 5, 1983, when she initially went to social services.

The circuit court's recitation of the evidence of coercion and duress noted: (1) the short time between A.K.W.'s leaving home due to the fight with Colleen and her decision to put her son up for adoption; (2) the fact that the Hookses lived in an affluent neighborhood and were better off financially than Lloyd and Colleen Williams; (3) Nell Hooks' opposition to A.K.W. keeping the child; and (4) Nell Hooks' offer that A.K.W. could live with her family again, but the baby could not.

### III.

"A parent who has not reached the age of eighteen shall have legal capacity to give consent to adoption and shall be as fully bound thereby as if said parent had attained the age of eighteen years." Code § 63.1-225(A). Such an agreement may be revoked prior to final adoption and the rights and obligations of the natural parent may be restored upon proof of fraud and duress,

Code §§ 63.1-204(C) and 63.1-225(C)(3).

The question on appeal is whether the evidence of duress or fraud was sufficient as a matter of law to negate the entrustment agreement. The evidence of duress or fraud must be clear and convincing. It was not. It showed that A.K.W. had discussed alternatives to adoption with her aunts and the division of social services. While her desire to live with her Aunt Hooks may have influenced her decision, that desire alone was not sufficient to void the agreement.

Other states have dealt with the question of the type of evidence of fraud and duress that is necessary to void a contract between a natural mother and an adoption agency. Most of the cases involve attempts by natural mothers to regain custody by claiming that they signed the adoption agreement under the influence of duress. The burden of proving duress in this case would be, if anything, greater since it is not the natural mother claiming duress, but *her* father and step-mother, neither of whom were parties to the agreement.

In the case of *In Re Adoption of Giambrone*, 262 So. 2d 566 (La. Ct. App. 1972), the mother testified that her doctor, mother and priest urged her to give up her baby. Her mother would not permit her to return home with the baby; she was unmarried at the time of its birth and only twenty years old. The court held that the testimony did not establish that the initial consent was obtained by fraud or duress and that mere counseling could not be considered duress. *Id.* at 569.

In *Regenold* v. *Baby Fold, Inc.,* 68 Ill. 2d 419, 369 N.E.2d 858 (1977), *appeal dismissed*, 435 U.S. 963 (1978), the mother testified that she faced assorted pressures when she signed an adoption agreement with Baby Fold, Inc. The factors noted were an unhappy marriage, divorce, quarrelling between her parents, pressures of work, as well as financial and health problems. The court held that the evidence did not amount to a wrongful act as contemplated by the Restatement of Contracts Sections 492(a) and 494. A wrongful act is defined there as either one which induces assent to a transaction different from that to which the apparent assent is manifested, or assent induced by the wrongful act is in effect the physical act of another. *Id.* at 435, 369 N.E.2d at 865.

In *Kathy O.* v. *Counselling & Family Services*, 107 Ill. App. 3d 920, 438 N.E.2d 695 (1982), the Illinois Appellate Court rejected a petition filed by a fifteen year old mother and father to regain custody of their infant child. The court held that the evidence was more than sufficient to show that the original agreement was voluntarily executed. It noted that duress is an unlawful act of one which induces another to make a contract under circumstances which deprive him of the exercise of his free will. The mother testified that alternatives to adoption were mentioned to her, that she understood that when she signed the consent she would have no rights to her child and that she would not be able to change her mind. She and the husband testified that they understood what they were signing and knew they did not have to sign. *Id.* at 925-27, 438 N.E.2d at 700-01.

In the *Matter of Adoption of Hewit*, 396 N.E.2d 938 (Ind. App. 1979), the mother signed an adoption consent agreement two days after the child's birth, her parents had abandoned and ostracized her when they learned of her pregnancy, she was only eighteen years old, and she had 'been incorrectly told that she could change her mind up to six months after the child was born. Noting that tension and pressure caused by parental disapproval were not uncommon, the court found that they were insufficient to void the consent unless they rose to the level of overcoming the mother's volition. *Id.* at 942. "Generally speaking, there is always present a form of duress when a consent to adoption is executed, but it is not duress of a type which renders void such consent." 2 Am. Jur.2d *Adoption* § 47 (1962).

■ In Virginia, duress is not readily accepted as an excuse. *Seward* v. *American Hardware Co.,* 161 Va. 610, 639, 171 S.E. 650, 662 (1933). The party alleging fraud is required to prove it by clear and convincing evidence, *Cary* v. *Harris,* 120 Va. 252, 255, 91 S.E. 166, 167 (1917), and duress is a species of fraud to which this rule applies. *Ford* v. *Engleman,* 118 Va. 89, 96, 86 S.E. 852, 855 (1915). While we have found no Virginia cases dealing with fraud and duress in the context of attempts to void adoption agreements, we believe that the rules developed in other areas should be followed.

Duress, in its more extended sense, means that degree of constraint or danger, either actually inflicted or threatened

and impending, which is sufficient in severity or in apprehension to overcome the mind and will of a person of ordinary firmness. . . . The requirements of common-law "duress" have been enlarged to include any wrongful acts that compel a person, such as a grantor of a deed, to manifest apparent assent to a transaction without volition or cause such fear as to preclude him from exercising free will and judgment in entering into a transaction.

\* \* \* \* \*

Duress may exist whether or not the threat is sufficient to overcome the mind of a man of ordinary courage, it being sufficient to constitute duress that one party to the transaction is prevented from exercising his free will by reason of threats made by the other and that the contract is obtained by reason of such fact. Unless these elements are present, however, duress does not exist. . . . Authorities are in accord that the threatened act must be wrongful to constitute duress.

6B Michie's Jurisprudence *Duress and Undue Influence* §§ 2-3 (Repl. Vol. 1985).

■ The general rule is that "duress must have been exercised upon him or her who sets it up as a defense, by him who claims the benefit of the contract, or by someone acting in his behalf or with his knowledge." *See* 25 Am. Jur.2d *Duress and Undue Influence* § 21 (1966).

■ The division of social services and the guardians *ad litem* for A.K.W. and the infant contend that Lloyd and Colleen Williams should not have been allowed to intervene in the entrustment agreement since they were not parties to it and thus should not have been allowed to assert duress as a ground for voiding the agreement. It is apparent, however, from the recent amendments to Code § 16.1-241 that the court was correct in ruling that the grandparents could intervene in the case. The pertinent portion of the statute, added in 1982, reads as follows in the undesignated paragraph at the end of subsection (A).

The authority of the juvenile court to adjudicate matters involving the custody, visitation, support, control or disposi-

tion of a child shall not be limited to the consideration of petitions filed by a mother, father, or legal guardian, but shall include petitions filed by any party with a legitimate interest therein.

While we read this section to confer authority to allow intervention in such a case by grandparents, we note that the section was clarified in 1984 by the General Assembly: "A party with a legitimate interest shall be broadly construed and shall include, but not be limited to, grandparents and other blood relatives and family members." Code § 16.1-241(A). While the grandparents were proper parties to intervene in this action, it does not follow that they could assert duress or fraud on A.K.W.'s behalf when she made no such assertion herself. Nothing in the statute indicates that the General Assembly intended to allow an intervening party to assert rights belonging to another, and we will not do so here. Since the agreement is valid, we will not address the contention that the court could *not* award custody to blood relatives when the natural parent objects.[10]

We do not find any evidence in this record to support the circuit court's determination that the agreement was procured by duress or fraud. There is no evidence that A.K.W. misunderstood what she was doing, nor any evidence that she was induced into signing the agreement by any wrongful act. We find that she freely and voluntarily entered into the agreement, and that it is, therefore, valid and binding on the parties to it. Accordingly, the decision of the circuit court is reversed, and the matter remanded for implementation of the entrustment agreement in accordance with this decision.

*Reversed and remanded.*

Baker, J., and Barrow, J., concurred.

---

[10] *See,* however, Code § 16.1-279(B):

Where a parent . . . seeks to be relieved of the care and custody of any child pursuant to Subsection A 4 of § 16.1-241 . . . the juvenile court or the circuit court may . . . make any of the orders of disposition permitted in a case involving an abused or neglected child . . . . provided, however, that no order of disposition pursuant to this paragraph B shall be made over the objection of any party, which was not provided for or requested in the entrustment agreement or in the petition's prayer for relief.