## Alexandria

### DONNA STANLEY

v.

### FAIRFAX COUNTY DEPARTMENT OF SOCIAL SERVICES

and

### JEANNE LYNCH, GUARDIAN AD LITEM

No. 0256-89-4

Decided July 17, 1990

Counsel

Barbara Sue Carter (Gardner & Carter, on briefs), for appellant.

Ann Gouldin, Assistant County Attorney (David T. Stitt, County Attorney; Jeanne B. Lynch, on briefs), for appellees.

Opinion

**KEENAN, J.**—Donna Stanley (mother) appeals from an order which terminated her parental rights pursuant to a petition filed by the guardian ad litem of her three children. The issues presented in this appeal are: (1) whether the guardian ad litem had authority to file a petition to terminate the mother's parental rights; (2) whether the trial court erred in terminating Stanley's parental rights as to Donnie Stanley when the most recent foster care plan submitted did not find such action to be in his best interests; (3) whether the trial court erred in not considering permanent foster care as an option; (4) whether the trial court erred in determining that clear and convincing evidence supported a find-

ing that termination of the mother's parental rights was in the best interests of the children; and (5) whether the trial court erred in excluding Ella Formando, the children's maternal grandmother, as a party to the proceeding. We find that the guardian ad litem did have authority to bring the petition. We further find that the trial court did not err in concluding that clear and convincing evidence supported a finding that termination of the mother's parental rights as to Irvin and Melvin Stanley, Jr. was in the children's best interests and met the requirements of Code § 16.1-283(C). We also find that the trial court did not err in rejecting permanent foster care as an option, and that the exclusion of the maternal grandmother as a party to the proceeding was not error. However, we reverse the trial court's decision regarding Donnie Stanley because the most recent foster care plan submitted did not recommend termination of the mother's rights as being in his best interests.

I.

In April, 1985, the juvenile and domestic relations district court (juvenile court) found that Irvin, Donnie, and Melvin Stanley, Jr. were abused and neglected children within the meaning of Code § 16.1-228(A).[1] Various counseling services were provided to the mother and Melvin Stanley, Sr. (father) at this time, and all three children were continued in foster care, where they had been since February 1985. In April 1987, the court returned Irvin to the mother's care and custody. Melvin, Jr. was returned to her custody in May, 1987. Donnie was placed with his maternal grandmother, Ella Formando, in August 1987. The Fairfax County Department of Social Services (Department) continued to work with

---

[1]   Code § 16.1-228(A) (1984 Supp.) provided:

A. "Abused or neglected child" means any child whose parents or other person responsible for his care:

1.   Creates or inflicts, threatens to create or inflict, or allows to be created or inflicted upon such child a physical or mental injury by other than accidental means, or creates a substantial risk of death, disfigurement or impairment of bodily or mental functions;

2.   Neglects or refuses to provide care necessary for his health; provided, however, that no child who in good faith is under treatment solely by spiritual means through prayer in accordance with the tenets and practices of a recognized church or religous denomination shall for that reason alone be considered to be an abused or neglected child;

3.   Abandons such child; or

4.   Commits or allows to be committed any sexual act upon a child in violation of the law.

the mother, assisting her with day-care arrangements, health matters, and other concerns.

In September 1987, paramedics responded to the Stanley residence. They observed that there was no furniture or food in the house and that it was cold inside. The children were dirty and were lying on a bare floor without shoes or blankets. Two days later, the mother and the two boys were found at the Keystone Motel, where they were sharing a room with the father, his sister and her son. When the mother refused to take the children elsewhere, the juvenile court removed them from her custody and again placed them in foster care. No new services were provided to the mother at this time.

In December 1987, the Department filed a foster care plan with the juvenile court pursuant to Code §§ 16.1-281 and 282. The plan recommended adoption as being in the best interests of all three children. In January 1988, the guardian ad litem filed a petition seeking termination of both the mother's and the father's parental rights, or in the alternative, placement of the children in permanent foster care. In September 1988, a second foster care plan was filed with respect to Donnie Stanley, recommending that he be placed with relatives, based on the amount of time he had lived with his maternal grandmother. On November 15, 1988, the juvenile court terminated both parents' parental rights and approved foster care plans providing for adoption of each child. The juvenile court found that the grandmother was not a suitable placement, that the three children should be placed together, and accordingly denied the grandmother's petition for custody which had been filed with the court. The mother appealed the juvenile court's decision. The father and the grandmother did not appeal. On February 24, 1989, after a hearing de novo, the trial court terminated the mother's parental rights as to all three children and approved the foster care plans recommending adoption.

## II.

The mother first argues that the trial court erred in determining that the guardian ad litem had authority to file a petition to terminate her parental rights. She contends that the guardian's proper role was to preserve the substantive rights of her children, not to eliminate them. In addition, the mother argues that a pro-

ceeding to terminate parental rights is an adversarial proceeding between the natural parents of the children and the state. Pursuant to Code § 16.1-266, the guardian ad litem is required to represent the children's best interests in any determination of residual parental rights. Further, Code § 16.1-282 expressly provides the guardian authority to petition the juvenile court for review of foster care plans. The mother asserts that considered in the context of these statutory provisions, it is significant that there is no express statutory provision for a guardian to petition for the termination of parental rights. She contends that absent any such specific authority, the guardian ad litem is not entitled to initiate a petition for the termination of residual parental rights.

In response, the Department argues that the guardian ad litem's duty to assert the best interests of the children should not be restricted by procedural limitations that are not statutorily provided. It contends that the appellate courts in Virginia have consistently upheld the guardian ad litem's procedural rights in carrying out his or her responsibility to represent the best interests of the persons he or she has been appointed to serve.

Initially, we acknowledge that this issue presents a matter of first impression in Virginia. Since there is no authority which directly addresses this procedural question, we begin by examining the statutory framework and underlying purposes of the role assigned to the guardian ad litem. Code § 16.1-266 provides for the appointment of a guardian ad litem to represent the interests of any child who is before the court because of an allegation of abuse or neglect, or who is the subject of an entrustment agreement or a petition terminating residual parental rights, or whose parents for good cause desire to be relieved of care and custody of the child. That section expressly provides that the guardian ad litem shall be appointed by the court prior to the hearing. We believe that this provision recognizes that the substantive rights and interests of the child are often separate and distinct from those of the other parties to the litigation. Further, Code § 16.1-266 recognizes that these rights and interests are best protected by an independent party.

Before the residual parental rights of an individual may be terminated, a separate proceeding must be conducted upon the filing of a petition specifically requesting such relief. Code § 16.1-283. We construe the term "separate proceeding" as used in Code

§ 16.1-283 to mean a hearing separate and distinct from an abuse and neglect adjudication, entrustment disposition, or foster care placement and review. This does not mean, however, that a totally separate case must be initiated in the juvenile court. Rather, the statute requires that initially, a petition must be filed specifically requesting termination of parental rights so that proper notice is given. Because of the potentially drastic consequences of a termination proceeding, a separate hearing must be conducted to ensure that the termination issue is not confused with other issues which may have been before the court previously. This interpretation of the term "separate proceeding" is consistent with the juvenile court statutory framework. We find that the legislature intended that this framework, rather than general rules of civil procedure, govern the manner in which cases are filed and proceed within the juvenile courts.

█ In the case before us, we find that Jeanne Lynch had already been appointed guardian ad litem for the Stanley children in the case which was still before the juvenile court at the time she filed the petition seeking termination of the parents' rights. Further, although Code § 16.1-283 requires that a foster care plan be filed with the juvenile court at or prior to the time that a termination petition is filed, it does not specify who may file a termination petition. The foster care plan documenting the need for termination can only be filed by the local board of public welfare or social services or the child welfare agency that has been given custody of the child. Code § 16.1-281. However, since there is no provision in Code § 16.1-283 restricting who may file a termination petition, we find that Lynch, as guardian ad litem, was not precluded from filing the termination petition because foster care plans had been filed with the court by the Department in accordance with Code § 16.1-281.

We find no merit in the mother's argument that since Code § 16.1-282 specifically gives the guardian ad litem authority to petition the court for a review of foster care placement, and no such authority is delineated in Code § 16.1-283, the legislature did not intend that the guardian ad litem have the right to file a petition seeking the termination of parental rights. While Code § 16.1-282 does specify what parties, including the guardian ad litem, may request a review of a foster care plan, Code § 16.1-283 is silent as to who may initiate a termination petition.

■ Code § 16.1-283 does, however, directly limit the right to initiate a termination petition by also requiring the filing of a foster care plan submitted in conformance with Code § 16.1-281, documenting termination as being in the best interests of the child. Therefore, under Code § 16.1-283, no termination petition can be accepted by the court unless the local board of public welfare or social services, or other child welfare agency which has custody of the child, presents the court with a foster care plan recommending termination as being in the best interests of the child. Thus, we find that Code § 16.1-283 does not restrict the guardian ad litem from initiating a termination petition as long as the required foster care plan recommending termination has also been filed. In the case before us, we find that since Lynch initiated her petition in conjunction with the Department's foster care plan, she was authorized to file it under Code § 16.1-283.

■ We also find Lynch's action to be consistent with existing authority defining the role of the guardian ad litem. The nature of the duties of a guardian ad litem was addressed by this Court in *Norfolk Division of Social Services v. Unknown Father*, 2 Va. App. 420, 345 S.E.2d 533 (1986), where we emphasized that the guardian ad litem is required to represent vigorously the infant or other person under a disability, fully protecting that individual's interests and welfare. *Id.* at 425 n.5, 345 S.E.2d at 536 n.5. In interpreting the scope of the guardian ad litem's duties, we held that the guardian ad litem for the unknown father was acting within his authority when he appealed the juvenile court's decision to terminate the natural parents' parental rights.

In *Givens v. Clem*, 107 Va. 435, 59 S.E. 413 (1907), the Supreme Court stated in dictum that a guardian ad litem has the authority to appeal a decision of the trial court to the Supreme Court in the name of the infants "by himself as such [guardian ad litem]." *Id.* at 437, 59 S.E. at 414. In *Givens*, the subject matter of the appeal involved the trial court's decision to order specific performance by an executor of a contract he had entered into for the sale of land. Although the authority of the guardian ad litem discussed in *Norfolk Division of Social Services* and *Givens* related to the appeal of cases rather than the filing of a petition in the juvenile court, we find that these functions are analogous in that both involve significant substantive action by the guardian ad litem. Both actions require the guardian ad litem to assume an

adversarial role in the litigation. Further, by definition, both require an affirmative course of action, as opposed to merely a defensive posture on behalf of the person under a disability. Therefore, since no specific statutory provision either grants or denies the guardian ad litem the power to file a petition seeking the termination of residual parental rights, we find that such action is consistent with *Norfolk Division of Social Services* and *Givens*, and implicit in the general charge of authority given the guardian ad litem in Code § 8.01-9 to represent faithfully the interests of the individual under disability for whom he or she is appointed.[2]

We next consider the issue of whether the trial court erred in terminating Donna Stanley's parental rights as to Donnie Stanley. Code § 16.1-283 establishes the authority of the court to terminate residual parental rights. However, as stated earlier, the court may only do so in a separate proceeding initiated by a petition specifically requesting such relief. Further, the statute provides that a petition to terminate residual parental rights may not be filed prior to the filing of a foster care plan pursuant to Code § 16.1-281 documenting that termination of these rights is in the best interests of the child.

In the case before us, the Department filed foster care plans in December, 1987 documenting that the termination of parental rights was in the best interests of all three children. The termination hearing began on April 6, 1988, and, after some recesses in the trial and continuances due to the court's docket, concluded on November 10, 1988. Although the Department was consistent throughout the proceedings in its recommendation that the mother's parental rights be terminated as to Irvin and Melvin, Jr., it changed its recommended goal for Donnie in September 1988 while the juvenile court proceedings were still in progress. Sometime after the juvenile court had ordered termination of parental rights with regard to all three children, and by the time the trial court proceedings had commenced, the Department changed its position again with regard to Donnie and joined in the petition of the guardian ad litem, relying on the November 1987 foster care plan which recommended termination of the mother's parental

---

[2] Code § 8.01-9 provides: "Every guardian ad litem shall faithfully represent the estate or other interest of the person under a disability for whom he is appointed and it shall be the duty of the court to see that the interest of such defendant is so represented and protected."

rights as to all three children.

The trial court ruled that since there was a foster care plan recommending termination of parental rights as to Donnie, even though it had been filed prior to the plan recommending that Donnie be placed with relatives, it was sufficient to fulfill the requirement of Code § 16.1-283 that a plan recommending termination of parental rights be filed before or at the time the termination petition is filed with the Court. We disagree. The plan recommending termination of parental rights as to Donnie was filed with the juvenile court in December, 1987. Approximately nine months later the Department amended its petition with respect to Donnie. We believe that in providing a foster care plan filing requirement in Code § 16.1-283, the legislature contemplated that the most recent plan of record would recommend termination of parental rights. If this were not so, any plan recommending termination which is in the record, regardless of how old or how much the circumstances of the family had changed, could be used to support a termination petition. Since many child abuse and neglect cases appear in court several times over a period of years, the court, in relying on a superseded plan, could proceed to take an action that is not in the child's current best interests. We decline to interpret Code § 16.1-283 in such a manner that would allow this result.

Instead, we believe that Code § 16.1-283 implicitly requires that the petition seeking termination of parental rights be directly preceded or accompanied by a foster care plan documenting that termination of parental rights is in the best interests of the child. Since the most recent plan filed with the court in this case did not recommend termination of parental rights as to Donnie, but rather recommended that he be placed with a relative, we find that the trial court erred in proceeding on the termination petition with respect to him.

The mother next argues that the trial court erred in not considering permanent foster care as an option in this case. We find no merit in this argument. A petition for permanent foster care is not a less drastic alternative to termination of parental rights. Instead, it is a wholly distinct alternative. *Martin v. Pittsylvania County Dep't of Social Servs.*, 3 Va. App. 15, 23, 348 S.E.2d 13, 17 (1986). Pursuant to Code §§ 63.1-206.1(A) and 16.1-281(B), the court can only consider permanent foster

care after it has determined that adoption, upon termination of residual parental rights, is not an alternative in a given case. Given this statutory preference, we find that permanent foster care is a distinct, and secondary, alternative to adoption, and thus, the trial court did not err in failing to consider it prior to acting affirmatively on the termination petition.

We now consider whether the trial court erred in finding that clear and convincing evidence supported termination of the mother's parental rights as to Irvin and Melvin, Jr. We do not review the evidence with regard to Donnie Stanley in light of our finding that the trial court committed reversible error in considering the termination petition with regard to him.

The mother challenges the sufficiency of the evidence supporting termination with respect to whether it showed that her failure to remedy her situation was without "good cause." Specifically, she argues that the record shows that the Department tried to force unsuitable methods of treatment on her.

In reviewing this allegation, we must consider the evidence in the light most favorable to the Department and the guardian ad litem, the prevailing parties in the trial court. *Martin*, 3 Va. App. at 20, 348 S.E.2d at 16. Viewed in this context, we find that the trial court did not err in ruling that clear and convincing evidence supported its finding that the mother's failure to remedy her situation was without "good cause."

Pursuant to Code § 16.1-283(C) termination of residual parental rights may be ordered by the court:

> [I]f the court finds, based upon clear and convincing evidence, that it is in the best interests of the child and that:
>
> 1. The parent or parents have, without good cause, failed to maintain contact with and to provide or substantially plan for the future of the child for a period of twelve months after the child's placement in foster care notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to communicate with the parent or parents and to strengthen the parent-child relationship; or

2. The parent or parents, without good cause, have been unwilling or unable within a reasonable period not to exceed twelve months to remedy substantially the conditions which led to the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

The evidence before the trial court showed that the mother was not providing for the most basic needs of the children at the time they were initially taken into foster care. The children were found clothed in urine-soaked diapers and lying on a bare mattress. Irvin, who was three and a half, was not toilet trained and all three boys suffered from severe diaper rash. In addition, both Donnie and Irvin were for the most part non-verbal, although Irvin did curse at the Child Protective Services worker on one occasion.

The trailer in which the family was staying was filthy, there was no heat, and the smell of urine was overwhelming. Further, there was no food in the trailer and the children did not appear to have been fed. At that time, the mother acknowledged to Kim Carr, the Department caseworker who responded to the Stanley home, that she had no money or plan for caring for the children and had been out all night trying to obtain money to buy diapers.

In April, 1985, after the juvenile court found that the Stanley children were abused and neglected within the meaning of Code § 16.1-228(A), it referred the mother to the Mount Vernon Community Mental Health Center for evaluation. There, it was recommended that she participate in a mental health program for low functioning adults. Due to her sporadic participation in that program, she was referred to the Social Center for Psychiatric Rehabilitation. This was primarily a vocational program, and the mother made better progress there. However, she did not attend the parenting classes to which she was referred.

During this time, the mother was frequently late for her scheduled visitations with the children and she and Melvin, Sr. would frequently argue in the reception area prior to visitation, prompting the staff to separate them. In addition, during the visitation, the mother had to be reminded to do such things as hold the baby and change his diapers.

Patricia Meyer, a clinical social worker, was assigned to work with the mother and taught her to budget, plan meals, shop, obtain employment, and manage the children. After an inital period wherein the mother made little progress, she did begin to show improvement by June 1986. With the help of Patricia Meyer, the mother was able to move from the trailer to a clean, albeit sparsely furnished apartment, separate from Melvin, Sr. and obtain a job.

In February, 1987, the Department recommended returning one of the children to the mother. The mother and children were therefore evaluated in April 1987 by Dr. Straw, a court appointed psychiatrist. Dr. Straw indicated that all three children were developmentally delayed, but appeared to be responding well to the attention of the foster parents. In addition, Dr. Straw noted that when evaluating the relationship between the mother and the children, the mother's coping skills did not appear inappropriate or overwhelmed but she was not capable of handling the children in a less structured setting without further support.

Irvin was returned to the custody of the mother in April, 1987, Melvin, Jr. was returned to her in May, 1987, and Donnie was placed with his maternal grandmother, Ella Formando, in August, 1987. The Department assisted the mother with day-care arrangements, and Patricia Meyer continued to work with her closely. When Meyer learned that the mother had diabetes, she offered the services of a public health nurse.

In September, 1987, paramedics responded to an emergency call to the father's place of residence to attend to the mother. There was no furniture or food in the house and it was cold inside. The children were lying on the bare floor without any blankets. The next day the mother informed the Department that she intended to vacate her apartment and live with the children and their father on a permanent basis. She, Irvin and Melvin, Jr. were then located in a room at the Keystone Motel which they were sharing with the father, his sister and her son. When she refused to leave this location, the children were taken from her and placed back in foster care. She visited the children once between October, 1987 and December, 1987. During this time, no new services were provided to her. In December, 1987, the Department submitted foster care plans to the juvenile court recommending adoption as being in the best interests of all three children.

Based on the foregoing evidence, we find that the trial court's ruling was not plainly wrong or unsupported by clear and convincing evidence. The record supports the trial court's conclusion that the mother was provided with comprehensive social and mental health assistance appropriate to her particular needs. The record further supports the finding that she failed to avail herself of many of these services. The trial court was entitled to consider this fact in making its determination. As stated by this court in *Barkey v. Alexandria Department of Social Services*, 2 Va. App. 662, 670, 347 S.E.2d 188, 192 (1986), "[t]he law does not require the [Department] to force its services upon an unwilling or disinterested parent."

Moreover, even with the benefit of these services, the mother was unable to carry out for any prolonged period the daily functions necessary for the care and well being of her children. Instead, as indicated by the evidence, the children were found to be lacking basic care within months after their return to the mother, requiring that they again be placed in foster care.

After their removal, the mother visited them only once in the two month period prior to the filing of the termination petition. Further, the mother demonstrated no concrete, workable plan for the children, notwithstanding the efforts of the Department on her behalf.

The mother argues that the children were returned to her too quickly in 1987. She did not object to this at the time, however, and the Department provided information to her regarding potential subsidized daycare services for Melvin, Jr. The Department also continued to offer her a variety of services at this time. Accordingly, we find no error in the trial court's failure to find that the circumstances under which the children were returned to her in 1987 prevented her from successfully caring for them. We also reject the mother's contention that the Department was planning to withdraw services from her in the summer of 1987. To the contrary, Felicia Kraft of the Department testified that there was no such plan and that services in fact were offered on a continuing basis. Once the decision to pursue termination was made, however, no further services were offered by the Department.

Finally, we note that the testimony of Dr. Straw, the psychiatrist appointed by the juvenile court to evaluate the mother and

the children, supports the trial court's finding. Dr. Straw emphasized that the children need a stable environment with a permanent primary caretaker. In spite of his earlier positive report, Dr. Straw recommended at the termination hearing against the mother being given another chance to attempt to stabilize her situation. Given this testimony, combined with the other testimony recited above, we conclude that the trial court was not plainly wrong in finding that there was clear and convincing evidence demonstrating a need for the termination of the mother's parental rights as to Irvin and Melvin, Jr.

We next consider the mother's argument that the trial court erred in excluding Ella Formando, the children's maternal grandmother, as a party in the termination proceedings. The mother argues that Formando had been Donnie's custodian for the year immediately preceding the termination hearing in the trial court, and therefore, she should have been allowed, pursuant to the discretionary authority given the court under Code § 16.1-283(A), to participate in the proceedings as a party. We disagree.

Code § 16.1-283(A) requires that written notice of the hearing be given to the foster parents of the children if they have had physical custody of the child for more than one year, informing them of their right to testify at the termination hearing. Further, it allows the trial court, in its discretion, to permit such foster parents to "otherwise participate in the proceeding." The record before us shows that the hearing in the trial court took place on February 24, 1989. As of December, 1988, Formando no longer had custody of Donnie. Therefore, we find that as a former foster parent, she did not have the right to ask the trial court to exercise its discretion to allow her to participate in the proceedings as a party. We also note that even though Formando was not allowed to participate in the termination proceeding as a party, the trial court did allow her to appear as a witness in the case.

For the reasons stated, we affirm in part and reverse in part.

*Affirmed in part,*
*reversed in part.*

Barrow, J., and Cole, J., concurred.