COURT OF APPEALS OF VIRGINIA


Present:    Judges Elder, Beales and Senior Judge Annunziata


BRIANCA THOMAS

                                                           MEMORANDUM OPINION[*]

v.    Record No. 0009-12-2                                       PER CURIAM
                                                          JUNE 12, 2012

RICHMOND DEPARTMENT OF SOCIAL SERVICES


FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
Margaret P. Spencer, Judge

(Rhonda L. Earhart, on briefs), for appellant.

(Kate D. O'Leary; Office of the City Attorney, on brief), for
appellee.

(Richard H. Lippson), Guardian *ad litem* for the minor child. [1]


Brianca Thomas (mother) appeals from an order terminating her parental rights to her son,

B.A.S.  Mother argues that the trial court erred by finding that (1) clear and convincing evidence

existed to terminate mother's parental rights under Code § 16.1-283(C) and approving a foster care

plan with the goal of adoption, and (2) permanent foster care was not in the best interests of the

child.  Upon reviewing the record and briefs of the parties, we conclude that this appeal is

without merit.  Accordingly, we summarily affirm the decision of the trial court.  See Rule

5A:27.

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] The guardian *ad litem* (GAL) supports appellant's brief "but only insofar as Appellant
requests permanent foster care as the dispositional outcome of this case."

BACKGROUND

We view the evidence in the light most favorable to the prevailing party below and grant to it all reasonable inferences fairly deducible therefrom. See Logan v. Fairfax Cnty. Dep't of Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 462 (1991).

B.A.S. was born on June 9, 2009 with renal dysplasia, which is a congenital kidney abnormality. He also has end-stage kidney disease. His medical condition requires that he be on home dialysis for ten to twelve hours per day, for seven days a week. According to his doctor, Dr. Timothy Bunchman, B.A.S. also undergoes a "very aggressive nutrition therapy" via a gastric feeding tube. B.A.S.'s caregiver has to monitor B.A.S. carefully because he is at risk of infection and elevated blood pressure. The caregiver monitors B.A.S.'s blood pressure, weight, temperature, fluid status, and overall appearance. B.A.S. takes seven to nine medications per day, which must be given to him consistently each day at the same time. He is on the deceased donor kidney transplant list.[2]

Consistent care is critical before, during, and after the transplant. According to Dr. Bunchman, consistent care is defined as "meds on time, nutrition on time, showing up to clinic visits, lab work being done in a timely manner, attention to blood pressure, [and] attention to weight." If B.A.S. had an infection at the time of the transplant, he would not be eligible for the transplant. In addition, it is important that B.A.S. receive consistent care after the transplant so that his body does not reject the new kidney. He will be on medication for the rest of his life.

The Richmond Department of Social Services (the Department) initially became involved with the family in November 2009 because mother was unable to provide B.A.S. with a clean

_____

[2] According to Dr. Bunchman, there are approximately 120,000 people on the list for organ transplants, and 80,000 people are waiting for a kidney.

and stable environment. The Department filed for the removal of B.A.S. in February 2010 because mother had moved three times between November 2009 and February 2010.

In May 2010, B.A.S. was returned home. Prior to B.A.S. returning home, the Department referred mother to the Renal Advantage Clinic, so she could learn about his disability and care, including dialysis. She also was referred to CHIPS to deal with caring for small children. She received bus tickets. She was referred to the Flagler program for assistance with housing and to Goodwill for employment training.

While in mother's care, B.A.S. needed to have tubes placed in his ears because he was having frequent ear infections. At the time of the surgery, mother did not have proper identification, so the surgery could not occur. She failed to reschedule the surgery when she obtained the proper identification.

Between May and August 2010, B.A.S. had to be hospitalized because he had an infection around his central line. His central line had to be replaced.

In July 2010, the Renal Advantage Clinic checked on B.A.S. and found feces in his crib. B.A.S. was immediately hospitalized. The Renal Advantage Clinic also asked mother to keep a record of B.A.S.'s weight, blood pressure, temperature, and the cloudiness of the fluid being exchanged, but mother did not do so.

In addition to the other services provided, the Department arranged for in-home nursing services. Originally, the in-home services would be for eight to ten hours per day for five days per week. Mother did not feel that she needed that much assistance, so the in-home services were shortened to two to four hours per day. However, mother was not home when the nurse came for the second visit.

The Department filed for a protective order in August 2010 because a nurse could not reach mother in order to give B.A.S. his required medication, which he needed at a specific time for three days. Also, mother's phone number had changed.

In August 2010, the Department had a team decision-making meeting with mother, the social workers, and the nurses. The plan included that mother provide the Department and the renal clinic with any changes in mother's address and phone number. In addition, mother was required to keep the log of B.A.S.'s vital signs as required by the clinic.

Subsequently, the Department removed B.A.S. from mother's care because mother moved to a hotel and changed her phone number without contacting the Department or the renal clinic.

The goal of the initial foster care plan was to return home. The Department told mother that she needed to maintain stable housing for six months and notify the Department of any change in address or phone number. She had to participate in the CHIPS program, attend all of B.A.S.'s medical appointments, and attend all of B.A.S.'s visitations. She was required to participate in Goodwill's employment training and job interviews. She had to complete criminal and CPS background checks. She also needed to stay in contact with the foster parent.

Mother failed to meet the Department's requirements. Between August 2010 and October 2011, mother lived in five different residences, including a homeless shelter and the Salvation Army, and had several different phone numbers. Mother did not participate in the CHIPS program. Although mother was invited to all of B.A.S.'s medical appointments, she did not attend all of them. She did not participate in the Goodwill employment training. The Department scheduled visitation for every other week. Mother regularly visited B.A.S. and notified the Department when she had to miss a visit. She missed two visits because she

(a) delivered a new baby and (b) had an appointment with the housing authority. Initially, she contacted the foster care mother once a week, but contact decreased over time.

In April 2011, the Department filed a petition to terminate mother's parental rights because mother had not met the Department's requirements. In June 2011, the Richmond Juvenile and Domestic Relations District Court terminated mother's parental rights. Mother appealed. After all of the parties presented their evidence, the guardian *ad litem* argued that permanent foster care would be appropriate for this child. Mother agreed. The trial court determined that no facts were presented to show that the Department made diligent efforts to place the child for adoption and such efforts were unsuccessful or that adoption was not a reasonable alternative, as required by Code § 63.2-908. The trial court entered orders terminating mother's parental rights and approving the goal of adoption.[3] This appeal followed.

ANALYSIS

Termination of parental rights

Mother argues that the trial court erred in terminating her parental rights and approving the goal of adoption.

In reviewing a trial court's decision terminating parental rights, we presume the trial court "'thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'" Logan, 13 Va. App. at 128, 409 S.E.2d at 463 (quoting Farley v. Farley, 9 Va. App. 326, 329, 387 S.E.2d 794, 796 (1990)). The trial court has "broad discretion in making the decisions necessary to guard and to foster a child's best interests." Farley, 9 Va. App. at 328, 387 S.E.2d at 795. "When based on evidence heard ore tenus," the trial

---

[3] The trial court also terminated father's parental rights, but the termination of his parental rights is not the subject of this appeal.

- 5 -

court's judgment "will not be disturbed on appeal unless plainly wrong or without evidence to support it." Peple v. Peple, 5 Va. App. 414, 422, 364 S.E.2d 232, 237 (1988).

Mother's parental rights were terminated based on Code § 16.1-283(C)(1)[4] and (C)(2).[5]

> [S]ubsection C termination decisions hinge not so much on the magnitude of the problem that created the original danger to the child, but on the demonstrated failure of the parent to make reasonable changes. Considerably more "retrospective in nature," subsection C requires the court to determine whether the parent has been unwilling or unable to remedy the problems during the period in which he has been offered rehabilitation services.

Toms v. Hanover Dep't of Soc. Servs., 46 Va. App. 257, 271, 616 S.E.2d 765, 772 (2005) (quoting City of Newport News Dep't of Soc. Servs. v. Winslow, 40 Va. App. 556, 562-63, 580 S.E.2d 463, 466 (2003)).

---

[4] Code § 16.1-283(C)(1) states a parent's parental rights may be terminated if:

> [t]he parent or parents have, without good cause, failed to maintain continuing contact with and to provide or substantially plan for the future of the child for a period of six months after the child's placement in foster care notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to communicate with the parent or parents and to strengthen the parent-child relationship. Proof that the parent or parents have failed without good cause to communicate on a continuing and planned basis with the child for a period of six months shall constitute prima facie evidence of this condition.

[5] A court may terminate parental rights if:

> The parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed twelve months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

Code § 16.1-283(C)(2).

Since B.A.S. has serious medical needs, it is imperative that he receive consistent and quality care. Dr. Bunchman testified, "So having him in pristine care prior to the transplant would directly impact upon his quality of care at the time of transplant, his recovery from transplant, and his hospitalization stay." He later explained, "Consistent care will be the most important thing . . . . [I]f one loses their first kidney, the chance of being re-transplanted is diminished by about 40 percent and the death rate goes up."

Mother has not been able to provide the consistent care that B.A.S. needs. When B.A.S. was returned to her care from May 2010 to August 2010, mother did not maintain the necessary record of B.A.S.'s vital signs. When the child stayed with her, she did not maintain a sterile environment for him because the nurse found feces in his crib. B.A.S. was hospitalized twice while in her care because of an infection and risk of infection. Mother missed scheduled appointments with the nurse who was trying to give B.A.S. his necessary medication.

One of mother's greatest challenges was obtaining and maintaining adequate housing. Despite all of the services provided to mother, she lived in five different residences between August 2010 and October 2011. She lived in a home with her father, a home with her sister, a hotel, CARITAS, and Salvation Army. At the trial, there was evidence that she signed a year-long lease for a two-bedroom apartment, but she had done so at the end of September 2011 and moved in approximately one week before the hearing. Mother was living in the apartment with her husband and two other children. Although there were beds in the bedrooms and food in the refrigerator, the social worker testified that there was no living room or kitchen furniture, nor was there any food in the cabinets.

Furthermore, mother did not comply with other requirements from the Department. She did not go to job training at Goodwill, she did not participate in the CHIPS program, and she did

not attend all of B.A.S.'s medical appointments. Although she visited B.A.S. consistently, she did not maintain contact with his foster mother.

The child had been in foster care for approximately fourteen months at the time of the final hearing. "It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities." Kaywood v. Halifax Cnty. Dep't of Soc. Servs., 10 Va. App. 535, 540, 394 S.E.2d 492, 495 (1990).

The trial court did not err in terminating mother's parental rights and approving the goal of adoption.

Permanent foster care

Mother argues that the trial court erred in finding that permanent foster care was not in the child's best interests.

> A court shall not order that a child be placed in permanent foster care unless it finds that (i) diligent efforts have been made by the local department to place the child with his natural parents and such efforts have been unsuccessful, and (ii) diligent efforts have been made by the local department to place the child for adoption and such efforts have been unsuccessful or adoption is not a reasonable alternative for a long-term placement for the child under the circumstances.

Code § 63.2-908(B).

In closing arguments, the guardian *ad litem* and mother argued that the trial court should consider permanent foster care for B.A.S. as an alternative to termination of parental rights. The trial court held that there was no evidence that "diligent efforts have been made by the local department to place the child for adoption and such efforts have been unsuccessful or adoption is not a reasonable alternative for a long-term placement for the child under the circumstances." Code § 63.2-908(B)(ii).

However, as mother acknowledged, there was no petition for permanent foster care filed with the trial court. "A petition for termination of parental rights pursuant to Code § 16.1-283 does not encompass a petition for *permanent* foster care. The latter is not a less drastic form of the former, but rather is a different and distinct alternative." Martin v. Pittsylvania Cnty. Dep't of Soc. Servs., 3 Va. App. 15, 23, 248 S.E.2d 13, 17 (1986) (emphasis in original). "Pursuant to Code §§ 63.1-206.1(A) [now Code § 63.2-908] and 16.1-281(B), the court can only consider permanent foster care after it has determined that adoption, upon termination of residual parental rights, is not an alternative in a given case." Stanley v. Fairfax Cnty. Dep't of Soc. Servs., 10 Va. App. 596, 605-06, 395 S.E.2d 199, 204 (1990). Therefore, the trial court could not order permanent foster care. See Norfolk Div. of Soc. Servs. v. Hardy, 42 Va. App. 546, 556, 593 S.E.2d 528, 533 (2004).

## CONCLUSION

For the foregoing reasons, the trial court's ruling is summarily affirmed. Rule 5A:27.

Affirmed.