COURT OF APPEALS OF VIRGINIA


Present:    Judges Beales, Powell and Senior Judge Clements
Argued at Richmond, Virginia


J.M. LEWIS, JR.
                                                            OPINION BY
v.        Record No. 0980-08-2                  JUDGE RANDOLPH A. BEALES
                                                            MARCH 17, 2009
LYNNE H. LEWIS


              FROM THE CIRCUIT COURT OF CHESTERFIELD COUNTY
                              T.J. Hauler, Judge

              Melissa S. VanZile (Phoebe P. Hall; Hall & Hall, PLC, on briefs),
              for appellant.

              Alexander S. de Witt (Ronald S. Evans; Brenner, Evans & Millman, P.C.,
              on brief), for appellee.


        J.M. Lewis, Jr., (husband) and Lynne H. Lewis (wife) were divorced by an order entered in

the Chesterfield County Circuit Court on November 29, 2006, which incorporated the parties'

property settlement agreement (PSA) and reserved authority for the trial court to enter further

orders to effectuate the PSA. On April 9, 2008, the court entered two qualified domestic

relations orders (QDROs), as well as a final order resolving all outstanding issues. Husband

appeals from these April 9, 2008 orders. He argues that the trial court erred 1) in the amount of

husband's profit sharing plan that it awarded to wife, 2) in the amount of husband's pension plan

that it awarded to wife, 3) in ordering husband to provide life insurance for wife, and 4) in

awarding attorney's fees to wife and not awarding attorney's fees to husband. Upon review of

the record, we find the trial court erred only in ordering, under the facts of this case, that husband

provide life insurance to wife, and we remand the case for further proceedings consistent with

this opinion.

BACKGROUND

The parties married on October 29, 1983.  At the time, husband worked for Philip Morris, and he continued to work there throughout the marriage.  As part of his compensation package with that company, husband had a profit-sharing account and a pension plan.  When the parties separated on June 1, 2003, husband was still working for Philip Morris.

After their separation, the parties reached an agreement regarding equitable distribution, child support,[1] and spousal support.  They signed a PSA in December 2004 that required husband to pay spousal support of $2,355 per month to wife "until the death of either party, [wife's] remarriage, [wife's] cohabiting with a man, or until [husband] retire[d] from Philip Morris or [became] disabled to work at Philip Morris."  The PSA also divided husband's Philip Morris profit-sharing account so that wife received half "of the marital share" of that account, minus $101,579.50 deducted from wife's portion as payment to husband for his equity in the marital home and minus half the value of wife's IRA.  The parties stipulated during the trial proceedings that wife's net portion of the profit-sharing account was $187,517.65 as of the date of separation in June 2003.  The parties stipulated that the profit-sharing account had grown in value by 25.46%, i.e., an increase of $226,259.99, from the date of the separation on June 1, 2003, through the date of the evidentiary hearing on March 15, 2007.

The PSA also divided husband's pension from Philip Morris.  The agreement specifically stated that "the marital share of Husband's pension shall be divided 50/50, by a QDRO, by applying a coverture fraction[2] to the accrued benefit as of the date of separation [June 1, 2003]

---

[1] The parties have two children.  Only one child was under the age of eighteen when the parties endorsed the agreement.  No child support issues are raised in this appeal.

[2] "Coverture" is an archaic term referring to the condition of being a married woman. Black's Law Dictionary 373 (7th ed. 1999).  In this context, however, the term "coverture fraction" refers to a fraction or percentage used to determine the marital portion of a benefit plan, usually defined as the time during the marriage that the spouse was employed by the company

and Wife shall receive a separate share paid to her for her lifetime based on her actuarial life expectancy." (Footnote added.) Husband was fully vested in the pension plan at the time the parties separated.

The PSA also included a provision that required husband "to conclude the divorce on the above [no-fault] grounds, as soon as possible." The PSA gave the trial court jurisdiction to enforce the terms of the agreement, but the agreement did not provide for any specific means of enforcement or specific penalties for non-compliance.

In order to effectively divide the profit-sharing account and the pension in accordance with the PSA, the trial court was required to enter an order, i.e., a QDRO, directing Philip Morris to pay out the appropriate portion of the profit-sharing account to wife and another QDRO directing that the company pay out the appropriate portion of husband's monthly pension to wife.[3] However, after signing the PSA, the parties could not agree on the wording of the QDROs. Each party accused the other of delaying entry of the QDROs. Finally, on November 29, 2006, the trial court entered an order that granted the parties a divorce and that also ratified and incorporated the PSA. This order did not conclude the case, however, but instead left the matter on the court's docket for entry of the appropriate QDROs. The parties thereafter continued to argue about the QDROs and the division of the two retirement assets.

---

providing the benefit (the numerator) divided by the total time of the spouse's employment with that company (the denominator). 2 Brett R. Turner, Equitable Distribution of Property 149-63 (3rd ed. 2005). This fraction is then applied to the entire benefit at the time of the spouse's retirement to determine the marital portion of the retirement benefit. When, as here, the coverture fraction is applied to the accrued value in the pension plan as of the date of separation rather than as of the date of retirement, a slightly different coverture fraction is used – the numerator remains the same, but the denominator becomes the total time that the spouse worked for the company before the date of separation. Id. at 149-50.

[3] Turner discusses the development of the QDRO as a tool for dividing retirement assets when those assets are held in one spouse's name. 2 Turner, supra, § 6:18 to § 6:20 (discussing the nature of QDROs); see also Code § 20-107.3(K)(4) (authorizing the entry of QDROs).

On March 1, 2007, before entry of any QDROs and without informing wife of his intention, husband retired from Philip Morris. Pursuant to the PSA, he stopped spousal support payments to wife as of the date of his retirement. When husband filled out his paperwork to begin the distribution of the pension, he marked a box on the forms indicating that he wanted Philip Morris to pay out his pension "as a single life annuity" rather than requesting any joint and survivor annuity or any payment to wife. Husband then began receiving the full pension amount of $4,951.71 per month, until Philip Morris froze his benefits pending the outcome of this case. Wife did not receive any of the pension funds, either directly from Philip Morris or from husband. The parties agree that the current payouts under the pension plan cannot be altered to provide wife with benefits for her lifetime and that the $4,951.71 total monthly payments will stop upon husband's death.

During depositions, Diane Fleshman, a benefits analyst at Philip Morris, testified that on June 1, 2003, husband "was eligible to receive a full vested benefit at age 65 in the amount of $3,719.82" per month or a reduced benefit of $1,487.93 per month if he retired at age 55. This amount was accrued, but not payable, on June 1, 2003, as husband had not reached 65. However, Fleshman then explained that, although husband had not reached normal retirement age for full payment under a Philip Morris pension, he was receiving the "full, unreduced benefits" under the plan because he was a "Craft Employee" and, therefore, entitled to retire at age 53 with full, unreduced benefits, rather than having to wait until age 65. Fleshman then seemed to become confused again and began assuming that husband was not a Craft Employee. For example, even though she had previously testified during the deposition that husband had actually retired on March 1, 2007, and he was receiving "a full, unreduced [monthly] retirement benefit" of $4,951.71, she then stated, in response to husband's counsel's questions, that husband would not be able to draw any pension until September 1, 2008, and that his pension beginning

- 4 -

on that date would be $1,487.93 per month. She later explained that her statements regarding a reduction in benefits were irrelevant to husband's situation. When asked on redirect examination about these statements, Fleshman clarified that husband's current, actual monthly benefit was based on the number of months that he worked for Philip Morris, from June 1, 2003, to March 1, 2007, "added on to what he was entitled to as of June 1st, 2003." Fleshman also clarified that husband's benefits would not increase.

When husband retired, in addition to requesting payment of the pension benefits, he also withdrew the entire balance of the Philip Morris profit-sharing account, $1,114,905.64, without consulting wife. He put these funds into two different annuity accounts. One annuity account was opened approximately a week prior to the withdrawal of the profit-sharing funds and at that time contained $164,227.40 of husband's separate funds from an IRA. Husband deposited $914,905.64 from the profit-sharing fund into this account. Husband then created a new annuity account into which he deposited the remaining $200,000.

Husband began receiving periodic payments from these annuity accounts, but he did not give any portion of these payments to wife. According to the quarterly report introduced into evidence, between March and October of 2007, husband received $44,565.54 from the larger annuity account and $8,242.15 from the smaller account. Even with these withdrawals, the total balance in the two accounts from March to October 2007 grew by over $24,000.

The parties stipulated during the course of these proceedings that, at the time of their separation on June 1, 2003, wife's net portion of the profit-sharing account was $187,517.65, after the agreed-upon deductions enumerated in the PSA were taken out of her gross portion. The parties also stipulated that the funds in the profit-sharing account grew by 25.46 % between June 1, 2003 and March 15, 2007 (the date on which husband withdrew the funds). The parties

could not agree on the increase in the value of the funds after husband withdrew them from the profit-sharing account.

On August 10, 2007, wife filed a motion with the court, asking for entry of a QDRO that would award her a gross amount of $1,658.82 per month from the Philip Morris pension, starting from husband's retirement date. She also asked the court to order that husband obtain life insurance listing her as the beneficiary. Both parties presented evidence on these issues, including on attorney's fees.

The trial court issued an opinion letter on February 27, 2008. The court found that the "accrued unreduced benefit" value of the pension plan as of June 1, 2003 was $3,719.82. The court then awarded to wife $1,246.14 per month from husband's pension and required that husband obtain $200,000 in life insurance to replace wife's entitlement under the PSA to a pension payment for her lifetime. The court also awarded wife her initial share of the profit-sharing account, as well as interest on those funds from the time of separation and continuing. The court also awarded to wife her attorney's fees. The court entered a QDRO ordering distribution to wife of her interest in the profit-sharing plan, as well as a QDRO for pension plan payments to wife.[4] Finally, the court entered an order concluding the case.

ANALYSIS

A. Pension Plan

Husband argues that the trial court erred in awarding wife half of the marital portion of his Philip Morris pension plan. Essentially, he contends that the trial court should have used a figure lower than $3,719.82 to value the pension, and he contends that the trial court's award gives wife benefits based on husband's employment with Philip Morris after June 1, 2003, the

---

[4] The QDRO provides that wife's benefits under the plan "shall be paid to [her] in such form as elected by [husband] at the time of [husband's] benefit commencement."

- 6 -

date of the parties' separation. As these alleged errors involve factual findings by the trial court, we review the evidence in the light most favorable to the party who prevailed below, here, wife. Shackelford v. Shackelford, 39 Va. App. 201, 207, 571 S.E.2d 917, 919 (2002). On interpretations of the law as it applies to those facts, however, we review the trial court's ruling *de novo*, without deference to the prevailing holding below. Marvin v. Marvin, 51 Va. App. 619, 623, 659 S.E.2d 579, 581 (2008).

"'Marital share' means that portion of the total interest, the right to which was earned during the marriage and before the last separation of the parties . . . ." See Code § 20-107.3(G)(1); McGinniss v. McGinniss, 49 Va. App. 180, 186, 638 S.E.2d 697, 699-700 (2006). The trial court determined that the pension was worth $3,719.82 per month on June 1, 2003, the date that the parties separated. The evidence supports that finding. Therefore, we conclude that the trial court did not err in the amount of husband's pension that it awarded to wife.

Ms. Fleshman, a benefits analyst for Philip Morris, initially testified that husband's pension was worth $1,487.93 per month if he retired early, and those payments would not begin until 2008. However, Ms. Fleshman then realized that she was confused and had mistakenly assumed husband's pension fell under the typical provisions for such plans at Philip Morris. She then clearly explained that the $1,487.93 per month figure did not apply to husband's particular pension plan because he was a Craft Employee. Instead, Ms. Fleshman testified, husband was entitled to a pension of $3,719.82 per month, based on his years of service with Philip Morris from the time he began working for that company until June 1, 2003. She explained that he could not begin receiving that amount until he turned 55 years old, but husband had earned that amount of pension as of June 1, 2003. We find this evidence was sufficiently credible to support the trial court's determination that the accrued benefit in the pension plan was $3,719.82 per

month as of the date of separation and, thus, was the appropriate value to use when applying the coverture fraction to determine the marital share of the pension, as required by the PSA.

Husband argues that the trial court should have calculated the pension value based on Ms. Fleshman's testimony that husband could not retire until 2018 with full benefits of $3,719.82, but he could retire in 2008 with reduced benefits. However, Ms. Fleshman specifically recanted this testimony and explained that these retirement dates were irrelevant to husband's situation because he was a Craft Employee. In addition, as husband did retire *in 2007* with *full benefits* of $4,951.71, Ms. Fleshman clearly was correct when she explained that her previous testimony regarding the 2008 and 2018 dates did not apply to husband's Craft Employee pension plan.

Husband also argues that the $3,719.82 value includes the additional benefits that he earned in the pension plan after the parties separated on June 1, 2003. However, the evidence does not support his argument.[5] Ms. Fleshman specifically testified that the $3,719.82 per month figure was calculated using the date of separation, and, thus, it did not include husband's additional months of service to Philip Morris after that date. In addition, when husband did retire on March 1, 2007, he began receiving a monthly pension of $4,951.71 per month. This larger amount, which was not used by the trial court to determine the value of wife's share of the

---

[5] Usually, divorcing parties use an equation to calculate the marital portion of a pension without using the actual dollar value of the pension. As discussed in Primm v. Primm, 12 Va. App. 1036, 1037, 407 S.E.2d 45, 46 (1991), this equation divides the number of months that a spouse was both married and working for the pensioning company by the total number of months that the spouse worked for the company to derive a percentage of the pension's value that is marital. Here, husband worked for Philip Morris for a total of 33 years (396 months). Of that total, he was married to wife for 235 of those months. Using this equation (235 ÷ 396), the total marital share of the total pension was a little over 59%. Thus, the marital share would be $2,938.51 of the $4,951.72 per month. If the same type of calculation is performed using $3,791.82, a value determined at the time of separation and prior to husband working the additional three years, then the marital share as of June 1, 2003 was about 67% or $2,540.52 of the $3,791.82 per month. The trial court awarded wife $1,246.14 per month, less than half of either of these marital share calculations. Wife has not appealed this award.

pension, obviously included husband's additional months of service – months of service that Ms. Fleshman did not include when calculating the $3,719.82 amount. Thus, the trial court's award to wife did not include value in the pension plan that husband accrued after the separation.

The evidence in the record is sufficient to support the trial court's finding that the pension plan was worth $3,719.82 per month as of June 1, 2003, when the parties separated. That amount did not include credit for months of service after June 1, 2003. Thus, the trial court did not err in valuing and dividing husband's Philip Morris pension plan.

### B. Profit-Sharing Account

Under the parties' PSA, wife was entitled to "½ of the marital share of Husband's Philip Morris profit sharing account" minus certain offsets. Husband concedes that, based on this provision, wife was entitled to $187,517.65 of the account as of June 1, 2003. However, he argues that, based on Fahey v. Fahey, 24 Va. App. 254, 481 S.E.2d 496 (1997), and Baker v. Baker, 38 Va. App. 384, 564 S.E.2d 164 (2002), that the language in the PSA precludes an award of the interest accrued after that date to wife. Thus, he claims the trial court erred by awarding wife any portion of the growth on that account that occurred after June 1, 2003 – both the growth that occurred while the funds remained in the profit-sharing account and the growth after he placed the funds into the annuity accounts.

"The trial court's interpretation of the PSA is an issue of law that we review *de novo*." Stacy v. Stacy, 53 Va. App. 38, 43, 669 S.E.2d 348, 350 (2008) (en banc). Here, we find that Fahey and Baker do not apply to the language used in the PSA signed by husband and wife. Therefore, we conclude that the trial court did not err in distributing to wife that portion of the interest that accrued on her portion of the marital property.

In Fahey, the trial court had already entered a QDRO that distributed "'one-half of the accrued value of the Plan as of July 28, 1994,'" to Mrs. Fahey. 24 Va. App. at 256, 481 S.E.2d

- 9 -

at 497. Mrs. Fahey did not appeal that order nor did she ask the trial court to reconsider the order within twenty-one days of its entry. Id. When the administrator distributed the funds to wife, contrary to the explicit language of the QDRO, he transferred not just one half of the account as it existed on July 28, 1994, but also transferred to her half of the interest that had accrued on the account after July 28, 1994. Id. Mr. Fahey objected to the administrator's actions, and Mrs. Fahey countered by asking the trial court to amend the QDRO. Id. This Court found that, although Code § 20-107.3(K)(4) gives a trial court continuing authority to modify QDROs, the court could not amend the Faheys' QDRO in a manner inconsistent with the "manifest intent of the original order." Id. at 257, 481 S.E.2d at 497. In effect, this Court held in Fahey that the QDRO was a final order, so the trial court could not amend it more than twenty-one days after entry of the order. See Rule 1:1. Thus, wife was not entitled to the interest accrued after July 28, 1994.

In Baker, the Court also found that a wife was only entitled to half of a profit-sharing account as it existed at the time that particular husband and wife endorsed their PSA. 38 Va. App. at 386-88, 564 S.E.2d at 165-66. The Court found Mrs. Baker was not entitled to any increase in the value of the account after that date, given the express provision in the parties' PSA. Id. at 388, 564 S.E.2d at 166.

Fahey and Baker are clearly distinguishable from the situation before us now. Here, unlike in Fahey and Baker, no agreement or court order awarded to wife half of the marital share "as of" a particular date. Here, nothing in the language of the PSA specifically states that the parties intended to allot wife only half of the actual amount in the account on June 1, 2003. Instead, the PSA awarded wife half of the "marital share," which accrued passive interest after the parties separated and after the parties signed the PSA. This interest is clearly not part of husband's separate portion of the profit sharing account nor is it part of husband's marital

- 10 -

portion of the profit sharing account. Cf. Mann v. Mann, 22 Va. App. 459, 464-65, 470 S.E.2d 605, 607-08 (1996) (noting that the passive interest accrued on separate property remains separate). Thus, the interest that accrued on wife's portion of the marital share belonged to wife, just as the interest that accrued on husband's portion of the marital share belonged to husband.[6]

An additional factor also influences the decision here. In this case, husband took from wife the ability to control her portion of the profit-sharing account, without her permission. He exerted control over her portion after the PSA had specifically divided the account so that husband was no longer entitled to control that money. Thus, in awarding wife the growth on her portion of the profit-sharing account after husband took the money and put it into the annuities, the trial court simply gave effect to this intention of the PSA, which husband had frustrated. Husband acted unilaterally, taking upon himself the responsibility for wife's money. Therefore, wife should be entitled to any profit made from her portion of these marital funds. Otherwise, husband would receive the benefit of his inappropriate actions.

Although he claims that wife should be faulted for her "own delay and refusal" to present a QDRO, wife was not required to concede to husband's interpretation of the PSA. In addition, although husband had the ability to remove the funds from the profit-sharing account, he had no legitimate authority to remove wife's portion of those funds, according to both the PSA and the court's order incorporating that agreement. Wife was clearly entitled under the PSA, under the

_____

[6] Husband argued early in the trial proceedings that the interest accrued on his separate portion of this account was his separate property. He contended that wife wanted to limit the value of his separate portion of the profit sharing plan to the value when they married, without allowing for any interest or other passive increases in the value of these assets, to which the trial court responded, "Well, that's ridiculous." Husband agreed with the court's characterization of this argument, so it is difficult to understand the rationale for husband's argument now that wife should not receive a portion of the interest or other passive increases in the value of her portion of the marital assets from the date of separation, when half of the marital asset became her property under the PSA, until her portion of the asset was actually paid out to her.

- 11 -

court's order, and under basic principles of equity to the interest on her portion of the profit-sharing account, especially after husband removed those funds without her permission.

We find the trial court did not err in awarding wife the growth on her portion of the marital share of husband's Philip Morris profit-sharing account.

### C.  Life Insurance

Husband's actions when he filed his paperwork for his retirement deprived wife of her option, specifically granted to her under the terms of the PSA, to receive her portion of the Philip Morris pension over the course of her lifetime.  In an attempt to provide wife with the benefit of this option, despite husband's actions, the trial court ordered that husband obtain $200,000 of life insurance naming wife as the beneficiary.  Husband argues that the trial court did not have the authority to order that he obtain this insurance.  As husband makes a purely legal argument here, we review the award of life insurance *de novo*.  Harrell v. Harrell, 272 Va. 652, 656, 636 S.E.2d 391, 393 (2006) ("Under well-established principles, we review such questions of law de novo.").  We conclude that, although the trial court did not err in determining that wife was entitled to some remedy for husband's destruction of her right to a lifetime pension under the PSA,[7] the trial court did not have authority to order that husband obtain life insurance listing wife as beneficiary.

Clearly, the PSA did not address the issue of life insurance in any way, so the trial court did not derive authority to order husband to get the insurance under its terms.  Cf. Sullivan v.

---

[7] Husband argues throughout his brief that he simply retired, as he was entitled to do.  We agree that husband did nothing wrong in retiring.  He was under no obligation to continue working.  However, once the PSA was signed and the trial court incorporated that document into a court order, husband had no authority to act unilaterally and treat both the pension plan and the profit-sharing account as if they belonged solely to him.  In filling out the documents so that the pension came solely to him for his lifetime and in removing funds in the profit-sharing account so that he could earn an annuity on the entire amount, husband acted in contradiction of the PSA and the court order.

Sullivan, 33 Va. App. 743, 536 S.E.2d 925 (2000) (upholding a contempt finding where husband did not obtain life insurance as he agreed to do in the PSA). Furthermore, under Code § 20-107.3(G)(2), a trial court cannot order that a person obtain life insurance on himself for the benefit of a former spouse, although a court can order that a person elect to have survivor's benefits on a pension or annuity. See also Lapidus v. Lapidus, 226 Va. 575, 579, 311 S.E.2d 786, 788 (1984) (finding trial court had no authority to order husband to contract for life insurance). Therefore, the trial court did not have authority, as part of the equitable distribution here, to order that husband obtain life insurance for the benefit of wife.

Although wife cites several cases from other states where a trial court was permitted to award life insurance, those cases did not consider the effect of a statute like Code § 20-107.3(G)(2). She also argues that Code § 20-107.3(K), which allows a court to enter "additional orders" to effectuate a parties' agreement, allowed the court here to order that husband contract for life insurance and that he list wife as the beneficiary on that life insurance policy. However, in light of the specific prohibition in subsection (G) of that same statute, we cannot find that subsection (K) then allows the court to order that a party obtain life insurance. See Crawford v. Haddock, 270 Va. 524, 530, 621 S.E.2d 127, 130 (2005) (noting that "the specific controls the general . . .").

Although wife may be entitled to some remedy for husband's frustration of her rights under the PSA, the trial court crafted the wrong remedy here.[8] Code § 20-107.3(G)(2) specifically and clearly prohibits a trial court from issuing an order that would require that

_____

[8] Husband argued that the trial court was without authority to order that he obtain a life insurance policy, listing wife as the beneficiary. We address only this argument here. We specifically do not attempt to craft a remedy for wife's loss of income after the death of husband (assuming wife survives him) – a loss created by husband's elections at the time of his retirement, following the parties' endorsement of the PSA and the trial court's incorporation of the PSA into an order. The trial court is free to determine what other remedies might be appropriate.

- 13 -

husband obtain insurance for the benefit of wife. Therefore, we reverse the trial court's order that husband obtain life insurance and remand for further proceedings on this issue.

## D. Attorney's Fees

Husband argues that the trial court erred in awarding attorney's fees to wife because the court had no evidence on the parties' economic circumstances, because wife's documents evidencing her attorney's fees were not timely produced, and because the award to wife was not reasonable. Husband also argues that the trial court erred in denying his request for attorney's fees. "An award of attorney fees is within the sound discretion of the trial court, and we review the trial court's decision only for an abuse of discretion." Budnick v. Budnick, 42 Va. App. 823, 844, 595 S.E.2d 50, 60 (2004). In this case, we find the trial court did not err in awarding attorney's fees to wife nor did the court err in refusing to award such fees to husband.

Contrary to husband's contention, the trial court did have evidence of the parties' incomes and circumstances. The court knew the amount of the pension and the monthly payments from the annuities that husband had received. The court knew that wife had no income once husband stopped paying spousal support in March 2007. The trial court also knew how the property had been divided between the parties under the PSA. Therefore, the trial court had evidence on the parties' ability to pay these fees.

Husband also argues that wife's evidence of her attorney's fees was not timely filed under the pretrial scheduling order. He is correct that the trial court ordered that the parties take evidence via deposition and file those transcripts and other evidence prior to the parties' argument before the court. Wife did not file her evidence regarding attorney's fees prior to this deadline. However, in this case, the attorney's fees would be incomplete and speculative if filed prior to the completion of the argument. For this reason, the trial court reasonably accepted this evidence at the end of the parties' arguments rather than with the rest of the evidence. Husband

- 14 -

provides this Court with no case law that prevents a trial court from accepting evidence regarding attorney's fees after the closing of the record regarding the more substantive issues. In addition, husband does not argue that he was prejudiced by wife's failure to present this evidence earlier. He does not contend that he did not have sufficient time to investigate the expenses listed by wife or that he did not have an opportunity to object to any particular item.

The trial court had discretion to award attorney's fees. Smith v. Smith, 43 Va. App. 279, 290, 597 S.E.2d 250, 256 (2004). Given husband's behavior here, and his use of marital funds to the exclusion of wife, the award was not an abuse of that discretion.

CONCLUSION

The trial court did not err in its award of various retirement assets to wife or of attorney's fees, and, therefore, we affirm those parts of the trial court's decision. However, the trial court did not have authority to order that husband obtain life insurance listing wife as the beneficiary. Therefore, we reverse the trial court's award of life insurance and remand the case for proceedings consistent with this opinion. We decline both parties' requests to award attorney's fees and costs from this appeal.

Affirmed in part; reversed and remanded in part.