COURT OF APPEALS OF VIRGINIA

PUBLISHED

Present: Judges Beales, Malveaux and Senior Judge Clements
Argued by videoconference


W. NEIL WILLS

v.      Record No. 0117-20-4

LISA J. WILLS                                              OPINION BY
                                                   JUDGE RANDOLPH A. BEALES
LISA J. WILLS                                          FEBRUARY 9, 2021

v.      Record No. 0144-20-4

W. NEIL WILLS


FROM THE CIRCUIT COURT OF ARLINGTON COUNTY
Daniel S. Fiore, II, Judge

James Ray Cottrell; John K. Cottrell (Amy W. Spain; Cottrell
Fletcher & Cottrell, PC, on briefs), for W. Neil Wills.

Caroline E. Costle; Timothy R. Bradley (Cary S. Greenberg;
GreenbergCostle, PC, on briefs), for Lisa J. Wills.


        In these consolidated appeals, both W. Neil Wills ("husband") and Lisa J. Wills ("wife")

appeal from a final order of divorce of the Circuit Court of Arlington County (the "circuit

court"), awarding husband a divorce and addressing matters of equitable distribution, spousal

support, child custody, and child support. In husband's appeal, he presents twelve assignments

of error, primarily contending that the circuit court erred in finding that the parties' "Postnuptial

Agreement," signed approximately one month after the date of the marriage, was abrogated.

Husband also asserts that the circuit court erred in awarding wife prejudgment interest on a

retroactive child support award. Wife filed a cross-assignment of error in husband's appeal,

arguing that the circuit court erred in finding that she was not under duress when she signed the

"Postnuptial Agreement." Wife also filed her own appeal, assigning error to six decisions of the circuit court with respect to its equitable distribution and spousal support awards and its award of attorney's fees at trial.

## I. BACKGROUND[1]

Husband and wife were married on December 11, 2004, in Arlington, Virginia. They had one child, who was still a minor at the time of the circuit court proceedings. Husband and wife last separated on July 13, 2015, after which there was no reconciliation. On August 25, 2016, husband filed a complaint for divorce based on the parties' having been separated for more than one year. The complaint requested that the court affirm, ratify, and incorporate into a court order the agreement entitled "Postnuptial Agreement" that was signed by the parties on January 8, 2005. Wife filed an answer stating that the parties had separated and reconciled on several occasions following the signing of the Postnuptial Agreement and asking the court to find that the agreement was abrogated by one of these subsequent reconciliations pursuant to Code § 20-155.

On February 2, 2017, the parties appeared before the circuit court for a hearing to address whether the Postnuptial Agreement was abrogated by a subsequent reconciliation under Code § 20-155. Wife also testified regarding her alternative claim that the agreement should "be rescinded because of her involuntary endorsement under the duress of improper threats." She

---

[1] The record in these cases was sealed. Nevertheless, these appeals necessitate unsealing relevant portions of the record for purposes of resolving the issues raised by the parties. Evidence and factual findings below that are necessary in order to address the assignments of error on appeal are included in this opinion. Consequently, "[t]o the extent that this opinion mentions facts found in the sealed record, we unseal only those specific facts, finding them relevant to the decision in this case. The remainder of the previously sealed record remains sealed." Levick v. MacDougall, 294 Va. 283, 288 n.1 (2017).

claimed that she only signed the agreement because husband threatened to divorce her if she refused to do so.

At the hearing, husband and wife testified to two very different versions of events leading up to the signing of the Postnuptial Agreement. According to husband, the parties began discussing a premarital agreement in March of 2004, nine months prior to their marriage in December 2004. He testified that he did not want wife to sign an agreement until she had first consulted with an attorney and received documentation of that consultation. He explained that, before the marriage, wife met with an attorney who worked directly with his attorney on the details of a premarital agreement, but because of a billing dispute, wife's relationship with that attorney ended. Husband stated that the parties "didn't do anything" more with the agreement until the fall of 2004 when wife told husband that she wanted to get married on December 11, 2004, which husband described as a "special day" for the couple.

Husband testified that, in light of their plan to get married on December 11, 2004, wife consulted with another attorney about the premarital agreement. He stated that wife informed him that "she would have the letter [confirming the consultation] by the 10th and that we were going to get a married, we were going to get married on the 11th. That was her plan. Our plan." He testified that the night before they were going to get married, he came home to find wife very upset. She told him that she had gone to the attorney's office to get the letter and was informed that it was not ready. Husband stated that wife suggested they just sign the agreement right away so that they could get married the next day. However, because he wanted her to have the letter prior to signing the agreement, he told her that they could go ahead and get married the next day, December 11, and then immediately after have an attorney draw up a document that would "allow us to have the same protections that a prenuptial agreement encompassed."

Husband testified that the week after they got married, he spoke with his attorney about making the proposed premarital agreement into a postnuptial agreement. The parties then signed the Postnuptial Agreement on January 8, 2005. Husband stated that, from the time of the marriage up until the time they signed the agreement, they were living together and having marital relations.[2] He denied having "shouting matches" about the agreement although he stated that they had "a serious discussion" where he told her that he needed the agreement signed. He agreed that wife "wasn't enthusiastic" about signing either a premarital or a postnuptial agreement but stated that "she signed it knowing that it would keep us together." He testified that he was honest with wife about how he "would not feel comfortable staying in the marriage if I did not have a document to protect me in the event of a divorce."

Over the objection of husband's counsel, wife's counsel asked husband a number of questions about several occasions during the marriage when husband and wife had arguments, leading husband to move out of the marital bedroom or the marital home, and about the couple's subsequent reconciliations. Husband admitted to having arguments with wife and to sometimes sleeping in the guest room or another location after these arguments.

Wife testified that she had not wanted to sign a premarital agreement and that they had not agreed to sign a postnuptial agreement prior to getting married. She stated that, the day after Christmas, they called husband's parents and told them about their recent marriage. She explained how, when husband's mother asked about an agreement, husband "took me off the speaker and then talked to them alone." She stated that, soon after that conversation, husband told wife that she had to sign the agreement or "he's going to cancel the marriage and he's going

---

[2] During cross-examination, however, he stated that it was possible that he moved into the guest bedroom for a period of time between Christmas and the signing of the Postnuptial Agreement.

to get me divorced." She testified that he started "showing violent behavior" and that he moved out of the marital bedroom. Wife claimed that she went with husband to the bank to sign the Postnuptial Agreement because she "was so intimidated" and because she "trusted him that he would get divorced" if she refused to sign.

Wife also testified about a number of instances following the signing of the Postnuptial Agreement when she and husband had arguments which resulted in husband leaving the bedroom or leaving the house entirely. She described how they reconciled following these disagreements until they separated for a final time in July 2015.

At the hearing, husband's counsel argued that the last sentence of Code § 20-155 (which states, "A reconciliation of the parties after the signing of a separation or property settlement agreement shall abrogate such agreement unless otherwise expressly set forth in the agreement.") did not apply to the parties' Postnuptial Agreement. He argued that the Postnuptial Agreement was not a separation or property settlement agreement because the parties were not separated or in the process of ending their marriage. In fact, they were just beginning their marriage. Wife's counsel took the position that the parties were separated at the time that they signed the agreement but also argued that it was irrelevant whether the parties were separated. She argued that the agreement was a "property settlement agreement," and as such, "it will be abrogated if there's a reconciliation at some point after the signing."

In a memorandum opinion signed on June 13, 2017, the circuit court found that the agreement was abrogated by Code § 20-155 when the parties separated and then reconciled on one or more occasions following the signing of the agreement. Examining Code § 20-155, the trial judge stated, "Married persons, whether happily married or separated, may enter into an agreement to settle their respective property rights should the marriage subsequently dissolve, and should they separate or remain separated and then reconcile after signing the agreement, the

- 5 -

agreement is abrogated unless the writing otherwise provides." Thus, the circuit court essentially concluded that it was irrelevant whether the agreement was entered into with the intent to separate or with the intent to remain married. The circuit court also found that wife was not under duress when she signed the agreement and that she "was able to understand the terms of the Marital Agreement and freely signed it."

On November 20, 2017, husband filed a motion for reconsideration, again arguing that the Postnuptial Agreement was not subject to the last sentence of Code § 20-155. He also argued that, assuming the agreement was subject to the last sentence, the agreement was not abrogated because it states that it can only be terminated by a subsequent writing. The circuit court denied the motion for reconsideration on February 8, 2018. The circuit court also later denied a motion filed by husband requesting that the provision of the agreement regarding spousal support be severed from the rest of the agreement and remain in effect.

At a hearing on November 27, 2017, the circuit court awarded wife *pendente lite* spousal support in the amount of $3,000 per month and child support in the amount of $4,000 per month. The circuit court made the child support award retroactive to August 25, 2016 – the date that husband filed his complaint for divorce in which he sought a determination of child support. The retroactive principal amount due in child support was $64,920.57, and the circuit court required husband to pay half of this retroactive amount by December 15, 2017, and the other half by January 15, 2018. The *pendente lite* order stated that the "parties disagree as to whether interest runs on the retroactive amount and agree to reserve this issue for trial."

On June 11, 2018, the circuit court held a hearing to address primarily the equitable distribution, spousal support, and child support. It issued a memorandum opinion on these matters on November 4, 2019. In the opinion, the circuit court awarded husband a divorce, classified the parties' property as separate or marital, and divided the marital property. The court

- 6 -

also awarded wife $4,000 per month in spousal support.  Wife moved for reconsideration of the awards, which the circuit court denied.

On December 18, 2019, the circuit court held a hearing to resolve the remaining issues in the proceedings, including the issue of whether husband would owe prejudgment interest on the child support awarded retroactively at the *pendente lite* hearing.  After hearing argument, the circuit court ordered husband to pay prejudgment interest (accruing from August 25, 2016 through November 30, 2017[3]) on the court's *pendente lite* award of $4,000 per month to wife in child support.

The circuit court entered a final order of divorce on December 27, 2019, from which both parties appealed.

## II. ANALYSIS

### A. Husband's Appeal

#### Whether the Agreement was Abrogated by a Subsequent Reconciliation
#### (Husband's Assignments of Error One, Two, Three, Four, and Six)

In his appeal, husband contends that the circuit court erred in ruling that the Postnuptial Agreement was abrogated based on the parties' separating and reconciling subsequent to their signing the agreement.  Husband argues that the last sentence of Code § 20-155 does not apply to the parties' Postnuptial Agreement because that sentence applies only to separation agreements and property settlement agreements, which he defines as "agreements entered into while separated or as an incident of separating with an intent of either indefinite separation or future

---

[3] We assume that the circuit court intended to make the interest accrue through the date of the *pendente lite* hearing, when the child support was ordered, and that the trial judge mistakenly used the date of November 30, 2017, instead of November 27, 2017, the actual date of the *pendente lite* hearing.

divorce." He argues that, because the parties signed the Postnuptial Agreement with the intent to remain married, the Postnuptial Agreement is not affected by the last sentence of Code § 20-155.

Husband's appeal requires us to interpret the language of Code § 20-155. "The interpretation of a statute is a question of law, which the appellate court reviews *de novo*." Bryant v. Commonwealth, 67 Va. App. 569, 575 (2017), aff'd, 295 Va. 302 (2018). In interpreting Code § 20-155, we adhere to the well-established rules of statutory construction. "The Virginia Supreme Court has long held that 'when analyzing a statute, we must assume that "the legislature chose, with care, the words it used . . . and we are bound by those words as we [examine] the statute."'" Eley v. Commonwealth, 70 Va. App. 158, 163 (2019) (alteration and omission in original) (quoting Doulgerakis v. Commonwealth, 61 Va. App. 417, 420 (2013)). "Once the legislature has acted, the role of the judiciary 'is the narrow one of determining what [the legislature] meant by the words it used in the statute.'" Chapman v. Commonwealth, 56 Va. App. 725, 732 (2010) (alteration in original) (quoting Dionne v. Southeast Foam Converting & Packaging, Inc., 240 Va. 297, 304 (1990)). Consequently, "'[w]hen considering the meaning and effect of a statute, this Court follows the long-held standard that the clear meanings of words are controlling' and determines the legislature's intention from the plain language of the statute, 'unless a literal construction would involve a manifest absurdity.'" Id. (quoting Alston v. Commonwealth, 49 Va. App. 115, 124 (2006)).

In addition, as this Court stated in Epps v. Commonwealth, 47 Va. App. 687 (2006) (*en banc*), aff'd, 273 Va. 410 (2007):

> It is one of the fundamental rules of construction of statutes that the intention of the legislature is to be gathered from a view of the whole and every part of the statute taken and compared together, giving to every word and every part of the statute, if possible, its due effect and meaning, and to the words used their ordinary and popular meaning, unless it plainly appears that they were used in some other sense. If the intention of the legislature can be thus

> discovered, it is not permissible to add to or subtract from the words used in the statute.

47 Va. App. at 714 (quoting Posey v. Commonwealth, 123 Va. 551, 553 (1918)). See also Cook v. Commonwealth, 268 Va. 111, 114 (2004) ("Words in a statute should be interpreted, if possible, to avoid rendering words superfluous.").

Code § 20-155, which is entitled "Marital agreements," states as follows:

> Married persons may enter into agreements with each other for the purpose of settling the rights and obligations of either or both of them, to the same extent, with the same effect, and subject to the same conditions, as provided in §§ 20-147 through 20-154 for agreements between prospective spouses, except that such marital agreements shall become effective immediately upon their execution. If the terms of such agreement are (i) contained in a court order endorsed by counsel or the parties or (ii) recorded and transcribed by a court reporter and affirmed by the parties on the record personally, the agreement is not required to be in writing and is considered to be executed. *A reconciliation of the parties after the signing of a separation or property settlement agreement shall abrogate such agreement unless otherwise expressly set forth in the agreement.*

(Emphasis added).

The circuit court in this case applied the last sentence of Code § 20-155 to *all* marital agreements settling property rights. However, that interpretation is inconsistent with the statute's plain language. The first sentence of Code § 20-155 permits married persons to enter into the same types of agreements as parties intending to marry. See Code §§ 20-147 through 20-154 (governing premarital agreements). The second sentence of Code § 20-155 also addresses "marital agreements," explaining an alternate manner in which "such agreement[s]" may be executed. The final sentence of Code § 20-155, however, does not use the words "marital agreements" or refer back to "marital agreements" by using the words "such agreement[s]." Instead, in the last sentence of Code § 20-155, the General Assembly used the terms "separation or property settlement agreement." Because we must construe the statute to give effect and

meaning to "every word and every part of the statute," see Epps, 47 Va. App. at 714 (quoting Posey, 123 Va. at 553), we conclude that the final sentence of Code § 20-155 applies only to separation and property settlement agreements, a subset of the broader category of "marital agreements" addressed in the first two sentences of the statute.

Having concluded that the last sentence of Code § 20-155 applies only to "separation or property settlement agreement[s]," the next question before this Court is whether the Postnuptial Agreement at issue in this case was a "marital agreement" or both a "marital agreement" *and* "a separation or property settlement agreement." If the agreement falls only within the former category, then it was not affected by the last sentence of Code § 20-155 and not abrogated by one of the parties' subsequent reconciliations. If the agreement was both a "marital agreement" and "a separation or property settlement agreement," then the agreement was abrogated by one of the parties' subsequent reconciliations.

In order to determine what type of agreement the parties signed, we look to the agreement itself. See Amos v. Coffey, 228 Va. 88, 92 (1984) ("[W]hen the parties set out the terms of their agreement in a clear and explicit writing then such writing is the sole memorial of the contract and . . . the sole evidence of the agreement." (quoting Durham v. Pool Equip. Co., 205 Va. 441, 446 (1964))).

The agreement is entitled "Postnuptial Agreement," and it recites that the parties were married on December 11, 2004. It states that "each party is aware of the fact that by virtue of their marriage, each shall or may acquire certain rights in the property of the other, either during their mutual lives or upon the death of either party" and that they "desire by this agreement to settle and determine their respective property rights and all other rights and demands arising out of the marriage relationship." The agreement contains various provisions governing how the parties will act *during the marriage* and how those obligations will change in the event of a

- 10 -

divorce or separation. For example, it provides that husband will name wife as the primary beneficiary in his will "so long as the parties are neither separated nor divorced." It provides that both parties waive their rights to spousal support but requires husband to pay wife $5,000 per full year for the first five years of their marriage and then $10,000 per full year for the next five years of their marriage for a maximum payment of $75,000. It also requires husband to pay wife $2,000 per full year of marriage into a retirement account of her choosing until she turns sixty, unless the parties separate, in which event the payments will be terminated.[4] The agreement requires husband to maintain a life insurance policy on himself with wife as the beneficiary that will remain "in full force and effect so long as the parties are not separated." It also provides that the division of property shall be in accordance with the Postnuptial Agreement "[i]n the event of separation, divorce, or death."

Certainly, the Postnuptial Agreement at issue is a "marital agreement" as it was an agreement between married people "settling the rights and obligations of either or both of them" regarding matters upon which Code §§ 20-155 and 20-150 specifically permit them to contract. See Code § 20-150 (enumerating subjects permissible in premarital contracts). It is also clear that the agreement is not a separation agreement as the terms of the agreement anticipate a continuing marriage, including requiring husband to make yearly payments to wife *during the marriage*. Although the Postnuptial Agreement addresses the parties' rights and obligations in the event of a divorce or separation, those potential events are treated as contingencies – not imminent likelihoods. Therefore, because the agreement is not a separation agreement, the remaining question is whether the agreement is a "property settlement agreement."

---

[4] Husband testified that he made all the deposits required by the agreement. Wife, while denying knowing that these deposits had been made at the time husband made them, agreed that she later learned that husband had made the deposits and that the money was in her accounts.

- 11 -

In Virginia, spouses in the process of separating often enter into agreements that they entitle "property settlement agreements" in order to settle any obligations between them relating to property and support.[5] See 24A Am. Jur. 2d Divorce and Separation § 972 ("If spouses, *upon their separation or impending divorce*, create a contract that, considered as a whole, evidences that the parties intended it to be a final settlement of all obligations between them concerning their property of any kind, *courts consider it to be a property settlement agreement*." (emphasis added)). While no Virginia appellate court has expressly stated that a property settlement agreement refers only to an agreement made in connection with the dissolution of a marriage, the Supreme Court has strongly suggested that it was the legislature's intention in drafting the last sentence of Code § 20-155 for agreements signed *during separation proceedings* to be abrogated when the legislature chose to use the term "property settlement agreement." In Flanary v. Milton, 263 Va. 20, 23 (2002), the Supreme Court stated that "the 1998 amendment to Code § 20-155 [which added the final sentence to the statute] *anticipates agreements made during proceedings for dissolution of a marriage*, by providing that a signed separation or property settlement agreement is abrogated if the parties reconcile unless otherwise specifically provided in the agreement." (Emphasis added). The Supreme Court's interpretation comports with the plain language of the statute as it accounts for the General Assembly's decision to use the words "separation or property settlement agreement" – rather than "marital agreement" – in the statute's final sentence. Therefore, we hold that only separation and property settlement

---

[5] Case law from this Court and the Virginia Supreme Court establishes that parties and courts routinely refer to agreements made in connection with the dissolution of a marriage as "Property Settlement Agreements." See, e.g., Baldwin v. Baldwin, 44 Va. App. 93, 95 (2004) ("[I]n anticipation of divorce, the parties executed a property settlement agreement.); Garland v. Garland, 12 Va. App. 192, 193 (1991) ("[T]he parties executed a property settlement agreement in anticipation of a pending divorce action."); Irving v. Divito, 294 Va. 465, 468 (2017) ("In the course of obtaining a divorce [decedent] executed a property settlement agreement[.]").

agreements, which are marital agreements made in connection with the dissolution of a marriage or a separation, are abrogated by a reconciliation between the parties.[6]

Turning to the agreement at issue, we conclude that the Postnuptial Agreement at issue here was not a "property settlement agreement" as that term is used in Code § 20-155. The agreement was signed less than a month after the parties were married with the intent that their marriage continue. The terms of the Postnuptial Agreement show that it was intended to provide the parties with the same rights and obligations as a premarital agreement, which Code § 20-155 expressly permits. The agreement was not made in connection with the dissolution of the marriage or a separation. Consequently, the last sentence of Code § 20-155 does not apply to this Postnuptial Agreement, and the agreement was not abrogated by one of the parties' later separations and reconciliations. Accordingly, we reverse the circuit court and remand the case for proceedings consistent with this opinion, given that the Postnuptial Agreement at issue here was still in effect – not abrogated – at the time of the divorce.[7]

---

[6] Any other reading of Code § 20-155 would lead to an absurd result. See Alger v. Commonwealth, 40 Va. App. 89, 94 (2003) ("Where a particular construction of a statute will result in an absurdity, some other reasonable construction which will not produce the absurdity will be found." (quoting Mayhew v. Commonwealth, 20 Va. App. 484, 489 (1995))), aff'd, 267 Va. 255 (2004). Unlike with separation and property settlement agreements, when parties enter into marital agreements with the intention that they remain married, there is no separation from which the parties can reconcile. Parties sign these marital agreements to govern their rights and obligations while happily married *and* in the unfortunate event of death, separation, or divorce. When parties sign a property settlement or separation agreement in connection with a separation or the dissolution of their marriage, they sign the agreement with the intent that it govern the separation and the dissolution of the marriage. Thus, for parties who signed a separation or property settlement agreement, a reconciliation drastically changes the nature of their relationship and presumably nullifies the need for the agreement in the first place.

[7] Wife argues that because the statute uses the word "or" between the terms "separation" and "property settlement agreement," those terms must have different meanings. We disagree. The use of both terms establishes the legislature's recognition that parties who enter into agreements concerning the dissolution of their marriage generally refer to these agreements as either "separation or property settlement agreement[s]." To the extent that there are any

- 13 -

<u>Husband's Motion *in Limine* to Exclude Evidence of Separations and Reconciliations</u>
<u>(Husband's Assignment of Error Five)</u>

In his fifth assignment of error, husband contends that the circuit court "erred in not granting the Husband's Motion in Limine concerning the relevance of alleged separations and reconciliations which occurred after the date of the Postnuptial Agreement." Husband argues that if he "is correct that separations which occurred after the execution of the Agreement cannot form the basis for abrogation under § 20-155, then evidence of such separations was not relevant to the proceedings." Because we reverse the circuit court's decision that the Postnuptial Agreement was abrogated under the last sentence of Code § 20-155, which was the premise for its decision to deny the motion *in limine*, we also reverse the circuit court's decision on husband's motion *in limine* and remand the case for the circuit court to determine the admissibility of this evidence in light of our holding that the agreement was not abrogated.

<u>The Equitable Distribution and Spousal Support Awards</u>
<u>(Husband's Assignments of Error Nine, Ten, and Eleven)</u>

In assignment of error nine, husband argues, "The Trial Court erred in awarding equitable distribution to the Wife not in accordance with the provisions of the parties' Postnuptial Agreement." In assignment of error ten, he argues, "The Trial Court erred in awarding spousal support not in accordance with the parties' Postnuptial Agreement." The agreement contains provisions governing how the parties' property will be divided in the event of separation or divorce and states that "no marital property shall be subject to any claim for . . . equitable distribution under Section 20-107.3 of the Code of Virginia as amended." The agreement also states that the "parties hereto waive any and all rights to permanent and temporary spousal support from each other, now or in the future." Because the circuit court erroneously determined

---

distinctions between separation agreements and property settlement agreements, we do not need to address them in order to decide this case.

- 14 -

that the agreement was abrogated, it also erred in making the equitable distribution award and in making the spousal support award without regard to the provisions of the agreement. Consequently, we reverse the equitable distribution and spousal support awards made by the circuit court and remand for proceedings consistent with this opinion.

In assignment of error eleven, husband argues that the circuit court "erred in awarding prejudgment interest on the equitable distribution monetary award." Because we reverse the circuit court's equitable distribution award, we also reverse the award of prejudgment interest on that award.

### Husband's Alternative Arguments
#### (Husband's Assignments of Error Six,[8] Seven, and Eight)

In assignment of error seven, husband contends, "The Trial Court erred in finding that the parties' Postnuptial Agreement was abrogated by the parties['] conduct of reconciling in contradiction of the plain language of Paragraph 12 of the Postnuptial Agreement which expressly provides that the Postnuptial Agreement can be revoked or terminated only by a written instrument." In assignment of error eight, husband argues that the circuit court "erred in ruling that the Postnuptial Agreement's provisions addressing spousal support were not severable and still enforceable even if the property division aspects of the Postnuptial Agreement were not enforceable under the Trial Court's ruling abrogating the Postnuptial Agreement." Because we conclude that the circuit court erred in finding that the agreement was abrogated, we do not need

---

[8] In assignment of error six, husband contends that the circuit court "erred in denying the Husband's Motion for Reconsideration." In his motion for reconsideration, he argued that the Postnuptial Agreement was not abrogated by the parties' subsequent reconciliations because the last sentence of Code § 20-155 did not apply to the Postnuptial Agreement – and that the agreement was not abrogated because it stated that it could only be revoked by a written instrument. Accordingly, we addressed assignment of error six *supra* together with assignments of error one through four, and we address it again here in connection with husband's alternative argument that the agreement was not abrogated because it could only be revoked by a subsequent writing.

to reach husband's additional arguments in the alternative on assignments of error six, seven, and eight.

<u>Prejudgment Interest on Retroactive Child Support</u><br><u>(Husband's Assignment of Error Twelve)</u>

In his twelfth assignment of error, husband argues, "The Trial Court erred in awarding prejudgment interest on the retroactive child support award." Husband acknowledges that, pursuant to Code § 20-108.1, liability for child support is mandatorily retroactive to the date of the filing of the action. Accordingly, he agrees that when the circuit court made the *pendente lite* award, the circuit court properly made the award retroactive to August 25, 2016, the date the complaint for divorce was filed, resulting in a retroactive support award of $64,920.57. However, husband argues that, while Code § 20-78.2 makes interest mandatory on child support arrearages, a retroactive child support award in an initial child support award order is not an "arrearage" requiring mandatory interest because nothing was due until the court set the amount and ordered that it be paid.

"Under well-established principles, an issue of statutory interpretation is a pure question of law which we review de novo." Conyers v. Martial Arts World of Richmond, Inc., 273 Va. 96, 104 (2007). Code § 20-78.2 states:

> The entry of an order or decree of support for a spouse or for support and maintenance of a child under the provisions of this chapter or §§ 20-107.1 through 20-109 shall constitute a final judgment for any sum or sums in arrears. This order shall also include an amount for interest on the arrearage at the judgment interest rate as established by § 6.2-302 unless the obligee, in a writing submitted to the court, waives the collection of interest; and may include reasonable attorneys' fees if the total arrearage for support and maintenance, excluding interest, is equal to or greater than three months of support and maintenance.

The question before this Court is whether the retroactive child support order was an "arrearage" under Code § 20-78.2. Black's Law Dictionary defines "arrear" which is "[a]lso

termed *arrearage*" as: "1. The quality, state, or condition of being behind in the payment of a debt or the discharge of an obligation" and "2. An unpaid or overdue debt." Arrear, Black's Law Dictionary (11th ed. 2019); see also Deluca v. Deluca, No. 1560-18-3, at *20 (Va. Ct. App. Aug. 27, 2019) ("Arrearages are support obligations that are due and have gone unpaid.").

The retroactive child support in this case was not an "arrearage" because it was not "unpaid or overdue" at the time the circuit court ordered husband to pay it. It was not until the *pendente lite* hearing on November 27, 2017, that husband was actually ordered to pay any amount of child support, making it impossible for him to be in arrears for an amount not determined or ordered. Furthermore, while the *pendente lite* order refers to the retroactive award as an "arrearage," as if the award were past due, when the circuit court ordered husband to pay the retroactive child support from the bench on November 27, 2017, the circuit court set a future due date for the payment of the retroactive award. The circuit court ordered that one half of the retroactive amount of child support be paid by December 15, 2017, and that the other half be paid by January 15, 2018. Therefore, the retroactive award did not become due until December 15, 2017, and January 15, 2018, and it was not overdue at the time of the hearing when the support was initially ordered. See Cnty. of Nicollet v. Haakenson, 497 N.W.2d 611, 616 (Minn. Ct. App. 1993) ("Retroactive child support constitutes an arrearage *only if it is not paid when due*." (emphasis added)); Richardson ex rel. Lanier v. Junious, 509 N.Y.S.2d 759, 760-61 (N.Y. Fam. Ct. 1986) (distinguishing an arrearage from retroactive support). Wife does not claim on appeal that the retroactive child support was not paid by the due dates of December 15, 2017, and January 15, 2018. Consequently, the retroactive child support awarded was not an arrearage under Code § 20-78.2, and the circuit court thus erred in requiring husband to pay prejudgment interest on the retroactive child support award. Therefore, we reverse the circuit court's award of prejudgment interest on the claimed "arrearage" because there was actually no such arrearage.

- 17 -

<u>Wife's Cross-assignment of Error</u>

Wife filed a cross-assignment of error in response to husband's appeal, arguing that the circuit court erred in failing to find "that she signed the Agreement involuntarily under legal duress, as improper threats of a groundless divorce are a sufficient basis to void the Agreement." She contends that the "evidence in this case was unequivocal that Ms. Wills signed the Agreement for no reason other than because [husband] threatened to divorce her if she did not."

> Duress may exist whether or not the threat is sufficient to overcome the mind of a man of ordinary courage, *it being sufficient to constitute duress that one party to the transaction is prevented from exercising his free will by reason of threats made by the other and that the contract is obtained by reason of such fact.* Unless these elements are present, however, duress does not exist. . . . Authorities are in accord that the threatened act must be wrongful to constitute duress.

<u>Pelfrey v. Pelfrey</u>, 25 Va. App. 239, 246 (1997) (omission in original) (emphasis added) (quoting <u>Norfolk Div. of Soc. Servs. v. Unknown Father</u>, 2 Va. App. 420, 435 (1986)); <u>see also</u> <u>Goode v. Burke Town Plaza, Inc.</u>, 246 Va. 407, 411 (1993) ("Duress exists when a defendant commits a wrongful act sufficient to prevent a plaintiff from exercising his free will, thereby coercing the plaintiff's consent."). "The party alleging fraud is required to prove it by clear and convincing evidence, <u>Cary v. Harris</u>, 120 Va. 252, 255 (1917), and duress is a species of fraud to which this rule applies." <u>Unknown Father</u>, 2 Va. App. at 434. <u>See also</u> <u>Sims v. Sims</u>, 55 Va. App. 340, 349 (2009) ("Wife 'had the burden at trial to prove by clear and convincing evidence the grounds alleged to void or rescind the agreement.'" (quoting <u>Drewry v. Drewry</u>, 8 Va. App. 460, 463 (1989))).

With respect to wife's cross-assignment of error alleging duress, we review the facts in the light most favorable to husband, and grant him the benefit of all reasonable inferences stemming from those facts because he was the party that prevailed below before the circuit court

on this issue. <u>Congdon v. Congdon</u>, 40 Va. App. 255, 258 (2003).  Viewing the evidence in accordance with this established principle, we cannot say that the circuit court erred in finding that wife did not sign the agreement under duress.  The circuit court made a finding of fact that wife "freely signed it."  Put another way, the circuit court found that wife did not sign it as a result of husband's threat to divorce her.  This finding is supported by credible evidence in the record, including husband's testimony, which illustrated that wife signed the agreement in accordance with the plan they had made even before they were married.  He testified that he and wife had agreed to sign a premarital agreement but that various circumstances prevented them from getting the document signed prior to their wedding date.  Husband testified that wife told him that she would get a letter from her attorney on December 10, 2004, stating that she had been advised by her attorney on the premarital agreement, so that they could sign the agreement and get married the next day, December 11, which was their "special day."  Husband stated, "That was her plan.  Our plan."  Therefore, even if husband also communicated to wife that he did not want to remain in the marriage without a signed such agreement, the record supports the conclusion that wife was not "prevented from exercising [her] free will by reason of" husband's statements – and that the Postnuptial Agreement was not "obtained by reason of such" statements.  <u>See</u> <u>Pelfrey</u>, 25 Va. App. at 246.  Consequently, the circuit court did not err in concluding that wife did not sign the agreement under duress.

## B.  <u>Wife's Appeal</u>

In addition to filing a cross-assignment of error, wife also filed her own appeal, asserting six assignments of error.  In her first three assignments of error, she contends that the circuit court erred in various respects while classifying and dividing property in the equitable distribution.  In her fourth assignment of error, she contends that the circuit court erred in setting the amount of spousal support awarded to her.  Because the Postnuptial Agreement contains

- 19 -

provisions governing the division of property and spousal support upon divorce or separation, and because we reverse the circuit court's ruling that the agreement had been abrogated, wife's first four assignments of error are now simply moot.

In her sixth assignment of error, wife argues that the circuit court erred "when it denied [her] request to reopen evidence to permit further evidence of [husband's] abusive behavior during the marriage, given that during trial, the court stated that it thought sufficient evidence of family abuse had been presented, and then 22 months later, the court (in its Memoranda Opinions) found that same evidence to be insufficient to make that same finding."  Wife contends that the circuit court heard evidence and made findings of family abuse during a February 20, 2018 hearing concerning child custody and informed her at the June 11, 2018 hearing, where the circuit court addressed spousal support and equitable distribution, that she did not need to repeat that evidence.  Wife claims that the circuit court, in its subsequent memoranda opinions, then "reverse[d] its stance" on the evidence of family abuse and refused to consider it as a negative non-monetary contribution to the well-being of the family.  Given that child custody and visitation are not before us in this appeal, given that the parties' Postnuptial Agreement covers the division of property and spousal support, and given that the Postnuptial Agreement is not abrogated but rather is in full force and effect, this assignment of error is moot.

Finally, in wife's assignment of error five, wife argues that the "trial court erred when it failed to award to Ms. Wills any final attorney's fees and costs for the litigation in the trial court when the financial equities of the parties were demonstrably disparate, litigation was extensive and complicated, and Ms. Wills did nothing to prolong or obstruct such litigation.  Ms. Wills submits that given the circumstances of the parties and the equities of the case, the trial court should have awarded substantial attorney's fees and costs."

"An award of attorney fees is within the sound discretion of the trial court, and we review the trial court's decision only for an abuse of discretion." Lewis v. Lewis, 53 Va. App. 528, 543-44 (2009) (quoting Budnick v. Budnick, 42 Va. App. 823, 844 (2004)). In her argument for attorney's fees, wife relies heavily on her need for maintenance and support and husband's ability to pay. However, while "relative financial abilities and support issues should be considered as factors in weighing the equities . . . these factors are not exclusively determinative of whether an award should or should not be made." Cirrito v. Cirrito, 44 Va. App. 287, 300 (2004). Furthermore, the circuit court did not ignore the financial disparities between the parties as it had already awarded wife $50,000 in attorney's fees in the *pendente lite* order. Consequently, we cannot say that the circuit court abused its discretion in declining to award wife more attorney's fees in the final order of divorce than it had already awarded.

## C. Appellate Attorney's Fees

Both parties request an award of appellate attorney's fees. This Court has discretion to grant or deny attorney's fees incurred on appeal. See Rule 5A:30(b); see also O'Loughlin v. O'Loughlin, 23 Va. App. 690, 695 (1996). In making this determination, this Court must "consider all the equities of the case." Rule 5A:30(b)(3). After considering the record before us and "all the equities of the case," we deny both parties' requests for appellate attorney's fees. The appeals involve novel legal questions, and neither party submitted frivolous arguments.

## III. CONCLUSION

In short, the circuit court erred in finding that the parties' Postnuptial Agreement was abrogated by one of the parties' subsequent separations and reconciliations. Pursuant to the plain language of Code § 20-155, only separation agreements and property settlement agreements – a subset of the broader category of "marital agreements" addressed by Code § 20-155 – are abrogated by a reconciliation of the parties. Both separation agreements and property settlement agreements,

- 21 -

as those terms are used in Code § 20-155, are agreements made in anticipation of the dissolution of a marriage or in connection with a separation of the parties. The Postnuptial Agreement at issue in this case, by its plain terms, was a marital agreement made with the intention that the parties would remain married. Several provisions in the agreement outline the rights and the obligations of the parties *prospectively* during the marriage, including provisions requiring husband to make yearly payments to wife while the marriage continued. Because the Postnuptial Agreement was a marital agreement – but not a separation or property settlement agreement – the last sentence of Code § 20-155 does not apply to this Postnuptial Agreement, and the agreement was not abrogated by the parties' later separating and then reconciling. Therefore, we reverse the circuit court with respect to husband's assignments of error one, two, three, four, five, and six, and we remand this case to the circuit court for further proceedings consistent with this opinion.

The circuit court also erred in making the equitable distribution and spousal support awards that it made in this case. The agreement provides that "no marital property shall be subject to any claim for . . . equitable distribution under Section 20-107.3 of the Code of Virginia as amended." It also states that both parties waive their rights to spousal support. Because this Postnuptial Agreement was not abrogated, the agreement controls the parties' rights to the marital property and governs spousal support. Consequently, we reverse the circuit court's equitable distribution and spousal support awards (husband's assignments of error nine and ten). Because we reverse the equitable distribution award, we also reverse the award of prejudgment interest on the equitable distribution monetary award to wife (husband's assignment of error eleven) because there should be no such award under the parties' Postnuptial Agreement.

As a result of our conclusion that the circuit court erred in finding that the agreement was abrogated by one of the parties' subsequent reconciliations, we do not reach husband's arguments in assignments of error seven and eight or in the portion of husband's assignment of

error six contending that the circuit court erred in finding that the Postnuptial Agreement was abrogated when it contained language stating that it could only be revoked by a written instrument.

We also reverse the circuit court with respect to husband's twelfth assignment of error. The circuit court erred in awarding wife prejudgment interest on the award of retroactive child support. Although Code § 20-78.2 makes prejudgment interest mandatory on child support *arrearages* unless waived by the obligee in a writing to the court, the retroactive award of child support made in this case was *not* an arrearage. At the time husband was ordered to pay the retroactive child support, no child support was actually unpaid or overdue. Consequently, we reverse the award of prejudgment interest on the retroactive child support award because there was actually *no arrearage*.

With respect to wife's cross-assignment of error, we cannot say that the circuit court erred in finding that wife did not sign the Postnuptial Agreement under the threat of duress. The circuit court made a finding of fact that wife "freely signed" the agreement, and viewing the facts in the light most favorable to husband, as the party that prevailed below on this issue before the circuit court, we cannot say that this finding of fact was plainly wrong. Viewing the facts in this manner, wife signed the agreement in accordance with her plan, formed prior to the marriage, to sign such a document – not because of a threat by husband to divorce her if she did not sign it. Consequently, we affirm the circuit court's finding that wife did not sign the Postnuptial Agreement under duress.

Turning to wife's appeal, we conclude that wife's first four assignments of error and wife's sixth assignment of error (all related to equitable distribution and spousal support) are actually moot. Because the Postnuptial Agreement contains provisions governing the division of property and governing spousal support upon divorce or separation, and because we reverse the

circuit court's ruling finding that the agreement was abrogated, the agreement is in full force and effect and controls the division of property and other issues raised in these five assignments of error. Therefore, we do not reach wife's arguments in assignments of error one, two, three, four, and six because they are now moot.

We affirm the circuit court's decision declining to award wife additional attorney's fees and costs incurred in the circuit court. While there were financial disparities between the parties, the circuit court had already awarded wife $50,000 in attorney's fees, and we cannot say that the court abused its discretion in declining to award her more attorney's fees. Therefore, we affirm the circuit court with respect to wife's fifth assignment of error.

For all of these reasons, we reverse the circuit court on husband's assignments of error one, two, three, four, five, nine, ten, eleven, and twelve, and the portion of assignment of error six contending that the agreement was not abrogated by the parties' separation and reconciliation because the last sentence of Code § 20-155 does not apply to the parties' Postnuptial Agreement. We do not reach husband's assignments of error seven and eight, and the portion of assignment of error six contending that the Postnuptial Agreement was not abrogated because the agreement states that it could only be revoked by a subsequent writing. We affirm the circuit court on wife's cross-assignment of error, we do not reach the merits of wife's assignments of error one through four and six because they are moot given our other holdings, and we affirm the circuit court on wife's assignment of error five.

                                                        Affirmed in part and reversed and remanded in part.